## WALLACE v. ADAMS.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

No. 260.   Argued December 21, 1906.—Decided February 25, 1907.

The power of Congress over citizenship in Indian tribes is plenary; it may
    adopt any reasonable method to ascertain who are citizens, and if one
    method is unsatisfactory it can try another; nor is its power exhausted
    because the first plan is by inquiry in a territorial court. The functions
    of a territorial court in such a case are those of a commission rather than
    of a court.
The act of July 1, 1902, 32 Stat. 641, creating the Choctaw and Chickasaw
    Citizenship Court and giving it power to examine, and in case of error
    found, to annul judgments of courts of Indian Territory determining
    citizenship in the Choctaw and Chickasaw Nations, was a valid exercise
    of power.
Congress has power to provide for the bringing of a suit in regard to citizen-
    ship in Indian tribes in a court of equity in which every class to be af-
    fected shall be represented and that those not actually made parties but
    who belong to the classes represented shall be bound by the decree.
Citizens are bound to take notice of the legislation of Congress.
143 Fed. Rep. 716, affirmed.

The facts are stated in the opinion.

*Mr. A. C. Cruce* and *Mr. Jackson H. Ralston,* with whom
*Mr. W. I. Cruce, Mr. W. R. Bleakmore, Mr. Frederick L.
Siddons* and *Mr. William E. Richardson* were on the brief,
for plaintiffs in error:

The citizenship court was not a court but a commission;
it was but an arm of the administrative branch of the gov-
ernment and could not exercise judicial functions and
therefore could not vacate a decree entered by the regularly
established courts. The Circuit Court of Appeals having de-
cided that the United States courts in the Indian Territory,
and the Supreme Court, in determining questions of Indian
citizenship were, themselves, not acting as courts, but prac-

tically as commissions, it must follow that the citizenship court, in exercising the jurisdiction conferred upon it, was likewise performing legislative and not judicial functions.

The citizenship court was not capable of exercising such judicial functions as to authorize it to vacate the decree of the United States court in the Indian Territory admitting Hill to citizenship. *Ex parte Joins*, 191 U. S. 93.

If the citizenship court was a judicial body, its decree, setting aside the decrees admitting parties to citizenship, is insufficient to accomplish that purpose as to any other than the ten defendants in that case. Before Hill could be affected by the decree of the citizenship court, he should have been made a party thereto. That court had no right or authority to assume that he was situated similarly to the other defendants. *Harwood* v. *C. & O. R. R. Co.*, 17 Wall. 78.

The questions submitted to the determination of the citizenship court by the act of July 1, 1902, which established that court, were in issue in and determined by, the various cases which came to this Court from the United States courts in the Indian Territory admitting parties to citizenship in the Choctaw and Chickasaw Nations. See *Stephens* v. *Cherokee Nation*, 174 U. S. 445, in which this Court decided that the act of June 10, 1896, was constitutional and that the cases should have been tried *de novo* in the territorial courts. If, after the lapse of four years, Congress had the right to create an inferior tribunal and authorize it to retry these same questions, there is no reason why it may not, at the end of another four years, establish another tribunal to undo the work of the citizenship court, and the litigation might be extended *ad infinitum*.

The act providing for the creation of the citizenship court was class legislation, and therefore unconstitutional. The act of 1890 put the Constitution in force in the Indian Territory, and, since that time, the various members of the Indian tribes have been as much entitled to its protection as citizens of the United States.

The defendant in his application for citizenship, complied literally with the rules adopted by the United States government and its agents, and that government, as well as the Choctaw and Chickasaw tribes, is estopped to claim that the proceedings admitting him to citizenship were irregular. *People* v. *Stephens,* 71 N. Y. 527; *Lindsay* v. *Haws,* 2 Black (U. S.), 554; *State* v. *Milk,* 11 Fed. Rep. 389; *State* v. *Flint,* 89 Michigan, 481; *Sanders* v. *Hart,* 57 Texas, 8; *State* v. *Dint,* 18 Missouri, 313; *Alexander* v. *State,* 56 Georgia, 478.

The Constitution intended that the Judiciary should be independent of Congress, and it would be a dangerous innovation if this court should hold that its final judgments and decrees are subject to the legislative will, in all cases appealed from what are called legislative courts, or where the controversy is about matters which are originally cognizable by Congress.

Congress may relinquish or surrender its plenary power over political questions, and this power once surrendered may never be resumed. *Ex parte Heff,* 197 U. S. 488; *United States* v. *Arredondo,* 6 Pet. 691; *Astiazaran* v. *Santa Rita L. & M. Co.,* 148 U. S. 80; *Den* v. *Hoboken Land & Imp't Co.,* 18 How. 272.

*Mr. George A. Mansfield,* with whom *Mr. J. F. McMurray* and *Mr. Melven Cornish* were on the brief, for the Choctaw and Chickasaw Nations (by special leave of court). No counsel appeared for the defendant in error.

That part of the act of Congress approved July 1, 1902, creating the Choctaw and Chickasaw Citizenship Court and governing its jurisdiction is constitutional and valid and the decrees of that court, rendered thereunder are regular and should be enforced.

The United States court in Indian Territory was without jurisdiction to entertain a suit in ejectment on behalf of an Indian allottee for possession of his allotment, on account of that provision contained in the act of July 1, 1902, specifi-

cally directing the Indian Agent by summary order, to put allottee. Indians in possession of their allotments, and providing that his action to that end should not be interfered with by the writ of process of any court.

It was the duty of the trial judge to have made the Choctaw and Chickasaw Nations parties to the suit under the provisions of section 12 of the act, of Congress approved June 28, 1898, 30 Stat. 495, and because of the failure of the trial judge to act as required by this law, the case should not have been permitted to proceed to final determination.

The establishment by Congress of the citizenship court was necessary and desirable; necessary to do justice to the Nations and desirable from the standpoint of the government, as permitting the administration of the estate of its wards and enabling it to bring to a final and correct conclusion all matters entrusted to its care as guardian. It was a necessary and proper exercise of the power of Congress to save the Nations from fraud and wrong. *McCullough* v. *Maryland,* 4 Wheat. 316, 344; *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *United States* v. *Kagama,* 118 U. S. 375.

The manner of its exercise is a matter of legislative discretion and cannot be controlled by the courts. *Cherokee Nation* v. *Hitchcock,* 187 U. S. 308; *Lone Wolf* v. *Hitchcock,* 187 U. S. 565.

In the creation of the citizenship court Congress has not exceeded its powers and the legislation is valid and constitutional, and the proceedings of the citizenship court thereunder are regular and they should be enforced. If there should be, however, a doubt as to its validity, that would not be sufficient to justify this court in declaring it unconstitutional. The doubt would be resolved in favor of its constitutionality. Cooley's Const. Lim., 6th ed. 216, and authorities cited.

MR. JUSTICE BREWER delivered the opinion of the court.

This was an action commenced in September, 1904, by

Mrs. Ella Adams, for herself and her minor children, defendants in error, in the United States court for the Southern District of the Indian Territory, to recover possession of a tract of land in that Territory. Defendants answered, and upon trial judgment was rendered in favor of plaintiffs. This judgment was sustained by the United States Court of Appeals of the Indian Territory, and on further appeal reaffirmed by the United States Circuit Court of Appeals for the Eighth Circuit. 143 Fed. Rep. 716.

The case arises out of the legislation of Congress designed to secure the disintegration of the tribal organization of the Five Civilized Tribes in the Indian Territory, and the distribution of the property of those tribes among the individual Indians. A full résumé of this legislation and the general litigation following it is to be found in *Stephens* v. *The Cherokee Nation*, 174 U. S. 445, and a full statement of the facts in this case is to be found in the opinion of the United States Circuit Court of Appeals. An entire restatement of these matters is, therefore, unnecessary.

There is but a single matter to be determined. As counsel for plaintiffs in error say:

"The assignment of errors presents but one question. If the decree of the Choctaw-Chickasaw Citizenship Court, in the test case known as the *Riddle case*, vacated the decree that defendant, Hill, had, theretofore, procured in the United States court for the Southern District of the Indian Territory, wherein he was adjudged to be a member of the Choctaw tribe of Indians, this case should be affirmed. If it did not, it should be reversed."

To properly appreciate and rightly answer this single question some things in the history of the legislation and litigation and also some of the facts in this case must be noticed:

In order to divide the lands of these Indian nations an enumeration of the individuals entitled thereto became necessary. By the act of March 3, 1893, 27 Stat. 645, c. 209, § 16, the commission to the Five Civilized Tribes, generally known

as the Dawes Commission, was empowered to negotiate and extinguish the tribal title to the lands and to make an allotment thereof to the members of the tribe in severalty. By that of June 10, 1896, 29 Stat. 339, 340, c. 398, the commission was authorized to hear the application and determine the right of each applicant for citizenship in either of these tribes. The act also granted an appeal to the proper United States District Court in the Indian Territory to any party aggrieved by the ruling of the commission, and declared that the judgment of that court should be final. It required the commission to make a complete roll of the citizens of each of the tribes, to be "hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes." Hill, who is the principal defendant, applied to be enrolled as a citizen of the Choctaw Nation, and his application was finally sustained by the court, and he was, on March 8, 1898, adjudged to be a member of the Choctaw tribe by blood and entitled to be enrolled as such. The land in controversy was selected and taken possession of by him in reliance upon this adjudication of citizenship. On July 1, 1898, Congress passed an act (30 Stat. 591, c. 545), granting to the tribes an appeal to the Supreme Court from the judgments of the United States courts of the Indian Territory in citizenship cases. Under the authority of this act many of these cases were appealed to this court, which affirmed the judgments. *Stephens* v. *Cherokee Nation, supra.* On March 21, 1902, an agreement was made between the United States and the Choctaw and Chickasaw Nations, which was confirmed by act of Congress July 1, 1902, 32 Stat. 641. This agreement and act were substantially that a court known as the Choctaw and Chickasaw Citizenship Court should be created, and that court should have power in a suit in equity brought by either or both of these tribes against any ten persons who had been admitted to citizenship or enrollment by the terms of the judgments of the several United States courts in the Indian Territory, as representa-

tives of all persons similarly situated, to determine whether the judgments of those courts should be annulled on account of certain alleged irregularities. The agreement and act also provided that in case the citizenship courts should decide that those judgments should be annulled, the papers in any action in those courts, wherein such a judgment had been rendered, should, upon seasonable application of either party, be transferred to the citizenship court, which should proceed to a hearing and determination of the question of citizenship. Under this agreement and act the court was established and a test suit brought, in which a decree was entered to the effect that the judgments of the United States courts in the Indian Territory, whereby persons were admitted to citizenship in the Choctaw and Chickasaw Nations under the act of June 10, 1896, were annulled and vacated. Hill was not named a party in that test suit, nor did he thereafter apply for a transfer of his case to the Citizenship Court. The above statement of facts is sufficiently full for an understanding of the single question presented for determination.

· That single question may be divided into two. First, was the decree in the Indian Territory court declaring Hill a citizen a finality, beyond the power of Congress to in any manner disturb? This was answered in the *Stephens case, supra.* In that case we held that Congress could authorize a review of the judgments of the United States courts of the Indian Territory in citizenship cases, and this although, by the terms of prior legislation, those judgments had become final. · While sustaining the act authorizing such review and providing for appeals to this court we construed it as limiting the appeals to the question of the constitutionality or validity of the legislation, and not as bringing before us the facts in the instances of all applications for citizenship. In the opinion (page 477) we said:

"The contention is that the act of July 1, 1898, in extending the remedy by appeal to this court was invalid because retrospective, an invasion of the judicial domain and de-

structive of vested rights. By its terms the act was to operate retrospectively, and as to that it may be observed that while the general rule is that statutes should be so construed as to give them only prospective operation, yet where the language expresses a contrary intention in unequivocal terms the mere fact that the legislation is retroactive does not necessarily render it void.

"And while it is undoubtedly true that legislatures can not set aside the judgments of courts, compel them to grant new trials, order the discharge of offenders or direct what steps shall be taken in the progress of a judicial inquiry, the grant of a new remedy by way of review has been often sustained under particular circumstances. *Calder* v. *Bull*, 3 Dall. 386; *Sampeyreac* v. *United States*, 7 Pet. 222; *Freeborn* v. *Smith*, 2 Wall. 160; *Garrison* v. *New York*, 21 Wall. 196; *Freeland* v. *Williams*, 131 U. S. 405; *Essex Public Board* v. *Skinkle*, 140 U. S. 334.

"The United States court in Indian Territory is a legislative court and was authorized to exercise jurisdiction in these citizenship cases as a part of the machinery, devised by Congress in the discharge of its duties in respect of these Indian tribes, and assuming that Congress possesses plenary power of legislation in regard to them, subject only to the Constitution of the United States, it follows that the validity of remedial legislation of this sort can not be questioned unless in violation of some prohibition of that instrument.

"In its enactment Congress has not attempted to interfere in any way with the judicial department of the Government, nor can the act be properly regarded as destroying any vested right, since the right asserted to be vested is only the exemption of these judgments from review, and the mere expectation of a share in the public lands and moneys of these tribes, if hereafter distributed, if the applicants are admitted to citizenship, can not be held to amount to such an absolute right of property that the original cause of action, which is citizenship or not, is placed by the judgment of a lower court

beyond the power of reëxamination by a higher court, though subsequently authorized by general law to exercise jurisdiction."

This decision established that no such vested right was created by the proceedings of the Dawes Commission or the judgments of the courts of the Indian Territory on appeal from the findings of the commission as prevented subsequent investigation. The power of Congress over the matter of citizenship in these Indian tribes was plenary, and it could adopt any reasonable means to ascertain who were entitled to its privileges. If the result of one measure was not satisfactory it could try another. The fact that the first provision was by an inquiry in a territorial court did not exhaust the power of Congress or preclude further investigation. The functions of the territorial courts in this respect were but little more than those of a commission. While the act of July 1, 1898, provided for an appeal to this court, and appeals were taken in many cases, yet our inquiry stopped with the question of the constitutionality of the legislation. In other words, we entertained and decided the purely judicial question of the validity of the means Congress had adopted for determining the matter of citizenship. We did not attempt to pass upon the question of citizenship in any particular case nor determine whether the applicant was or was not entitled to be enrolled as a citizen. It is unnecessary to consider what would have been the effect of a judgment of this court, a court provided for in the Constitution, on the question of the right of a litigant to citizenship. The distinction between this court and the courts established by act of Congress in virtue of its power to ordain and establish inferior courts is shown in *Gordon* v. *United States*, 117 U. S. 697, in which we held that while Congress could give to the Court of Claims jurisdiction to inquire and report upon claims against the Government, it could not authorize an appeal from such report to this court unless our decision was made a final judgment, not subject to Congressional review. In the opinion Mr. Chief Justice Taney said (pp. 699, 702):

"Congress may undoubtedly establish tribunals with special powers to examine testimony and decide, in the first instance, upon the validity and justice of any claim for money against the United States, subject to the supervision and control of Congress, or a head of any of the executive departments. In this respect the authority of the Court of Claims is like to that of an auditor or comptroller, with this difference only, that in the latter case the appropriation is made in advance, upon estimates furnished by the different executive departments, of their probable expenses during the ensuing year; and the validity of the claim is decided by the officer appointed by law for that purpose, and the money paid out of the appropriation afterwards made. In the case before us the validity of the claim is to be first decided, and the appropriation made afterwards. But in principle there is no difference between these two special jurisdictions created by acts of Congress for special purposes, and neither of them possess judicial power in the sense in which these words are used in the Constitution. The circumstance that one is called a court and its decisions called judgments can not alter its character, nor enlarge its power. . . . Congress can not extend the appellate power of this court beyond the limits prescribed by the Constitution, and can neither confer nor impose on it the duty of hearing and determining an appeal from a commissioner or auditor, or any other tribunal exercising only special powers under an act of Congress; nor can Congress authorize or require this court to express an opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties, and process of execution awarded to carry it into effect."

This decree was followed by legislation which in a general way provided that the rulings of this court on appeals from the judgments of the Court of Claims should be in effect judgments. While that case is not entirely parallel to this, yet the line of thought pursued in the opinion is suggestive.

We do not feel called upon to enlarge upon it. It is enough
now to hold that Congress in giving to the Indian Territory
courts jurisdiction of appeals from the action of the Dawes
Commission did not, place the decisions of these courts beyond
the reach of further investigation. Hence the act of Congress
of July 1, 1902, creating the Choctaw and Chickasaw Citizen-.
ship Court, and giving to it power to examine the judgments
of the Indian Territory courts and determine whether they
should not be annulled on account of irregularities was a
valid exercise of power.

The other question is one of procedure and not of power.
It is objected that the defendant Hill was not made a party
to the proceeding instituted in the citizenship court, but
there were a multitude, according to the report of the Dawes
Commission, probably one thousand, in whose favor judg-
ments of citizenship had been entered in the Indian Territory
courts, and the act provided that ten should be selected as
representatives of the class. It further authorized any indi-
vidual, in case of an adverse judgment by the citizenship court,
to transfer his case from the territorial to that court. Now, it
is undoubtedly within the power of a court of equity to name
as defendants a few individuals who are in fact the representa-
tives of a large class having a common interest or a common
right—a class too large to be all conveniently brought into court
—and make the decree effective not merely upon those individ-
uals, but also upon the class represented by them. *Mandeville*
v. *Riggs*, 2 Pet. 482; *Smith* v. *Swormstedt*, 16 How. 288; *Bacon*
v. *Robertson*, 18 How. 480, 489; *United States* v. *Old, Settlers*,
148 U. S. 427, 480. It was by way of extra precaution and in
order to more effectually secure the rights of the individuals
other than those named as parties defendant in that suit
that Congress provided that any one might transfer his in-
dividual case from the territorial court to the citizenship
court, and there have the merits of his claim decided. Hill,
as every other citizen, was bound to take notice of the legis-
lation of Congress, and it is not to be doubted that he as

well as others similarly situated were cognizant of the proceedings that were being had in pursuance of such legislation. He made no application to transfer his case, but chose to abide by the outcome of the case against the ten representatives of his class. The answers to these subordinate questions fully dispose of the main question. Without further discussion, we refer to the exhaustive opinion of Circuit Judge Sanborn, in delivering the judgment of the Court of Appeals, with which, in the main, we fully concur.

We find no error in the record, and the judgment of the Court of Appeals is

*Affirmed.*