Atkinson, J.,
delivered the opinion of the court:
The claimants herein file a motion for a new trial and amendments to the findings of fact, on the grounds that the findings and judgment of the court heretofore rendered are contrary to the law and the evidence.
The special act of Congress authorizing the court to hear, determine, and adjudicate, as justice and equity shall require, the claims of the Sac and Fox Indians of the Mississippi in loAva against the Sac and Fox Indians of the Mississippi in Oklahoma and the United States, is fully set forth in the findings and consequently need not be repeated here.
The Sac Indians first appear in treaty relations with the United States in 1789, when they AA^ere parties to a treaty with the Wyandotte and other Indians (7 Stats., 28). In 1804 (Ibid., 84) General Harrison was instructed to negotiate a treaty with them, the purpose being to secure control of the lands claimed by these Indians on the eastern side of the Mississippi Eiver and to offer them proper compensation for *297 the cession of the territory desired by the Government. In these negotiations the Fox tribe also appeared (their holdings being principally, if not entirely, on the west side of the Mississippi) and participated in the treaty. It was therein agreed that the Sacs should be paid an annuity of $600 and the Foxes $400 for the cession of their holdings, they being regarded as one nation (Ibid., 84), but they, however, preserved their separate tribal relations. Several additional treaties were subsequently negotiated with them, both as separate and as confederated tribes.
By the treaty of 1842 (7 Stats., 596) the Sac and Fox tribe was settled upon a reservation provided for them in Kansas, to which they were removed in 1845 and 1846 from their former reservation in Iowa. About the year 1855 a portion of the tribe, being dissatisfied with their Kansas location, left the reservation and returned to Iowa without the consent of the Indian agent in charge of them or other government officials.
In 1851 the Iowa legislature enacted a laAV authorizing them to remain in that State, but therein expressly provided that none but those at that time within the State should be embraced within its provisions. Here they purchased a tract of land with annuity funds which they had drawn prior to leaving their Kansas reservation and established themselves thereon, and there they still remain. It appears, however, that subsequent to 1855 and up until about 1867,. other members of the tribe left the Kansas reservation and rejoined their brethren in Iowa, in violation of the act of the Iowa legislature. From 1855 to 1866 there was no Indian agent with the band in Iowa, and they were not recognized in any manner by the Commissioner of Indian Affairs or the Secretary of the Interior, and consequently no annuities were paid to them as such band.
In 1867 (15 Stats., 495) another treaty was maqle with the Sacs and Foxes by which they were granted certain lands in the Indian Territory (now Oklahoma) in lieu of their holdings in Kansas, and pursuant to this treaty the main tribe was removed thither in 1869, where they now remain. The *298 year this treaty was concluded (1867) Congress enacted a law directing the Indian Office to pay the Iowa band their proportion of the annuities allotted to the Sac and Fox tribe, which has since that time been regularly done.
The claimant band of Sac and Fox Indians (those residing in Iowa) contend that from 1855 to 1867 they were entitled to their fro rata share of the annuities paid to the tribe while said tribe remained in Kansas and since they were located on the Oklahoma reservation, although they abandoned the tribe without its permission and contrary to the orders and authority of the Secretary of the Interior. They further contend that since 1867 they have been discriminated against in the distribution of annuities; that they are also entitled to a share in the proceeds of certain tribal lands sold to the United States pursuant to the treaty of 1859 (15 Stats., 467), and also to $500 salary per year for their chief for a period of thirty-seven years. All of which aggregate the sum of $454,215.80, with interest on a part thereof from an unascertained date, and for the recovery of which they bring this suit.
The defendant Indians, in substance, contend that claimants are not a legal entity, and hence a judgment in their favor could not extinguish such an indebtedness as is alleged in the petition; that from 1855 to 1867, when the Iowa band was absent from the regular tribe, without permission and without recognition by the Indian Office, the members of such band were not entitled to any part or share of the tribal annuity funds; that they have already received a greater proportion of tribal funds than they were entitled to under the various laws and treaties; and that under the treaty of 1859 the President and the Congress had full power to distribute the annuity funds of the tribe in such a manner as would be most advantageous to the tribe. Further, that by the act of May 17, 1882 (22 Stats., 78), Congress and the President stamped with their approval the manner in which the- Interior Départment had paid the annuities prior to that date. In 1884 (23 Stats., 85) the Secretary of the Interior was directed by the Congress to ascertain the number of Indians in the Iowa band. This was done and a fair basis of appor *299 tionment arrived at, which basis has been, since adhered to. The direction to the Secretary of the Interior by said act of 1884 imposed upon the Secretary the exercise of a discretion which in the absence of proof of abuse thereof or fraud can not now be inquired into by the courts; and, finally, that even though it should be shown that the claimants had received less than they were entitled to during the period covered by these claims, the United States are liable therefor and not the defendant Indians.
The United States have been made a party to the suit in order to comply with the legal requirement that where a suit is brought against a cestui que trust the trustee must be joined as one of the defendants, or where a suit is brought against a ward the guardian must also be made a party. It does pot appear that in all of theip numerous claims the claimant Indians have anywhere charged fraud in the official acts of the Interior Department, or that the money claimed was due them by the United States. Their contention is that they, as well as the defendant Indians, were wards of the Government, and that its agents had paid to the defendant Indians more than their proper share of certain specified funds due under various treaties between said defendant Indians and the United States. The fact that both Congress and the Indian Office have sought to deal fairly with both branches of this tribe is shown by the claim set out in Senate Document No. 16T, Fifty-fourth Congress, first session, wherein the Secretary of the Interior was directed to investigate certain claims of the Iowa band and report his findings thereon. This was done, as set forth in Finding XIII, and the report showed $42,893.23 to be due from the defendant tribe to the claimant tribe, which amount was promptly allowed by Congress and was passed to the credit of the Iowa band on the books of the Interior Department.
In the case at bar it was stipulated by and between the attorneys for the claimant and defendant Indians that certain affidavits of the Iowa band might be read as evidence in the trial of this cause, but the United States, who are a party to the suit, by their attorney, refused to sign said stipulation and are therefore not bound by it. But even if all the parties *300 to the suit had agreed to the proposed stipulation, the court would not be bound thereby. Counsel can not, by stipulation or otherwise, require a court to admit testimony which, under legal rules, is not admissible as evidence in a case. Hence said ex parte affidavits, even though they may be printed in the report of a congressional committee, can not properly be admitted as testimony in this litigation.
We have thus far discussed the case in general terms, which brings-us to a consideration of the specific claims contained in the petition.
I. The first claim made by the claimant Indians is for the annuities alleged to have accrued to them during the years 1855 to 1867, inclusive, while they were in Iowa and prior to their recognition, in any manner, by. the Department of the Interior. It is conceded that various members of the Sac and Fox tribe of their own volition abandoned the tribal reservation in Kansas and returned to what was formerly a part of their' reservation in Iowa, covering the period from 1855 to 1867; but the number that thus removed is not shown by competent evidence, nor is it shown how many of these Indians returned to Kansas, during that period, to receive their annuities, nor are their names given; but it does appear that some of them did thus return for that purpose. The court is, therefore, barred, for want of competent testimony, to properly consider this feature of the case.
Moreover, as these Indians had voluntarily and without the consent of the United States, withdrawn themselves from the reservation which had been provided for them by the Governmént they were no longer a legal entity; they were simply individual Indians who had willfully separated themselves from their tribe. The jurisdictional act, however, gives them a forum in which to maintain such rights as they may possess. (Stewart v. The United States, 206 U. S., 185.)
It has been the custom and policy of the Government not to pay to or reserve annuities for Indians who are absent from their reservation without permission, and the wisdom and force of this practice can not be controverted. It was held by this court in the Blackfeather case (37 C. Cls. R., 233, 241), which was affirmed by the Supreme Court (190 *301 U. S., 368), that “ The United States, as the guardian of the Indians, deal with the nation, tribe, or band, and have never, so far as is known to the court, entered into contracts, either express or implied, compacts, or treaties with individual Indians, so as to embrace within the purview of such contract or undertaking the personal rights of individual Indians.”
It is clear that inasmuch as the claimant Indians had voluntarily left the Kansas reservation provided by the Secretary of the Interior for the habitat of the tribe, it was their plain and unqualified duty to return to the agency (which it appears that some of them did) prior to the dates of the annual payments, and see that their names were enrolled for their individual shares of the annuities, because they must have known that the treaties which provided said funds required payment to be made to the Sac and Fox tribe at their established agency, and not elsewhere.
In the Journey calce ease (31 C. Cls. R.., 140) it was decided by this court that all Cherokee freedmen, who had abandoned their reservation and failed to return, were entitled to no part of the tribal funds; and in the more recent case of Pam-to-pee v. The United States (181 U. S., 371) the same principle is clearly laid down. The trend of the decisions of this court, and of the Supreme Court as well, in this class of cases is to the effect that it is the duty, of the Government to recognize tribes and not individual Indians in paying out annuities or other funds due to its Indian wards.
Considering all the facts which rightfully belong to this particular claim, the different treaties, the laws of Congress, the rulings of the Interior Department, and the decisions of the courts, we can not do otherwise than decide that no allowance can be made to claimants thereon.
II. The second claim, which is closely related to the first, is for a- share of annuity funds in addition to the amounts already paid to claimants from 1867 to 1899, and is set forth in paragraph 12 of the amended petition.
The treaty of 1867 provided that thereafter the claimants should share, in proportion to their population, in the annuities allotted to the Sac and Fox tribe, and they were paid their proportion according to an enumeration of the tribe *302 taken a¡t that time, and were so paid annually until 1885. The defendants contend that there can be no relief accorded claimants under this claim for annuities paid prior to 1884, because Congress has stamped with its approval all such annuity payments; nor can there be a recovery for payments made since that date because the money so paid has been disbursed strictly in accordance with the express provisions of a law enacted in that year, which gave the Secretary of the Interior discretionary powers in making the roll. (Kimberlin v. Commissioners to the Five Civilized, Tribes, 104 Fed. R.., 653.) Besides, the findings are not of a character upon which a judgment could be predicated, even though the legal principles for which claimants contend were well founded.
Under article 6 of the treaty of 1859 (15 Stats., 467) the President and the Congress were given absolute authority to establish a new basis for the distribution of the tribal funds of the Sac and Fox Nation. In the act of May 17, 1882 (22 Stats., 78), it was provided “That hereafter the Sacs and Foxes of Iowa shall have apportioned to them from appropriations for fulfilling the stipulations of said treaties no greater sum thereof than that heretofore set apart for them.” And the act of July 4, 1884 (23 Stats., 85), further provided “That hereafter the Sacs and Foxes of Iowa shall have apportioned to them, from appropriations for fulfilling the stipulations of said treaties, their per capita proportion of the amount appropriated in this act, subject to the provisions of treaties with said tribes; but this shall apply only to the Sacs and Foxes now in Iowa: And provided further, That this shall apply only to original Sacs and Foxes now in Iowa to be ascertained by the Secretary of the Interior.”
Thus it appears that from 1882 to 1885 there could not be paid to claimant band of Indians a greater sum of money annually than they had received prior to that time, which may be construed as a legislative approval of the manner in whi.ch the fund had been distributed previous to that date.
Under the act of 1884, supra, the Secretary of the Interior caused a census of the original Sacs and Foxes in Iowa to be taken, which showed their population to be 317, and from that time, including the year 1885, they were paid upon the basis thus determined.
*303 All the facts deducible from the admissible testimony bearing upon this particular claim are carefully set out in the findings. Under the act of March 2, 1895 (28 Stats., 876-903), the Congress directed the Secretary of the Interior to examine the claims of the claimant Indians, and ascertain whether under treaties or acts of Congress any amount is justly due them as a part of the Sac and Fox tribe of Indians of the Mississippi. In pursuance of said act the Secretary of the Interior made an investigation of all of the claims of the Ioiva band as set forth in their memorial to the Congress, which claims are practically the same as are involved in this suit. The investigation was duly made, and a balance of $42,893.25, as heretofore stated, was found to be due them, which amount, as shown by Finding XIII, was promptly paid.
III. The third item, which is set out in paragraph 13 of the amended petition, avers that claimants are entitled to $25,788.85 on account of an alleged unequal apportionment of annuities from 1900 to the time the suit was instituted. This claim is simply a continuation of the second. The two claims should have been considered together as one claim for the whole period of both. What we have said under the head of the second item applies with equal force to this one, and consequently no allowance can be made.
IY. This is a claim for $500 a year for thirty-seven years’ salary of the alleged chief of the claimant Indians. This claim is predicated on article 4 of the treaty of 1842, supra, which reads:
“ It is agreed that each of the principal chiefs of the Sacs and Foxes, shall hereafter receive the sum of five hundred dollars annually, out of the annuities payable to the tribe, to be used and expended by them for such purposes as they may think proper, with the approbation of their agent.” (7 Stats., 596.)
This article is an agreement between the United States on the one part, and the tribe on the other, providing that out of the annuities “ payable to the tribe ” $500 should be payable to each of the “ principal chiefs,” but “ with the approbation of their agent.” Subsequently a portion of the tribe of their own volition separated themselves from the main tribe and *304 were without an agent up to the year 1867. Had an agent in Kansas approved a payment to an alleged chief in the Iowa band, there would even then have been grave doubt of the legality under this provision to make such payment in view of the separation. If this were allowable, tribes would be rent and there would be no end to the confusion that would follow. While it is true that the act of May 31, 1900 (31 Stats., 245), directed the Secretary of the Interior to pay to the head chief of the Iowa band $500 salary per year, during 'the remainder of his natural life, beginning with the fiscal year of 1900, yet that does not imply that Congress intended that the chiefs who preceded him should also be paid a like salary, thus making the act retroactive. On the contrary, beginning with the fiscal year 1900, the court is prohibited from going back of that date. Much would have to be read into the act to authorize such procedure, and this we are not authorized to do. This is the construction given to the act by the Secretary of the Interior, and under the authorities we have already cited under the first item of the jDetition we would not be justified in overruling him. Nor is there anything in the special jurisdictional act controlling or that would justify such action. Hence no allowance can be granted under this claim.
V. The fifth and last item of the claim, which is contained in the fifteenth paragraph of the amended petition, relates to a share in a fund for land disposed of by the Sac and Fox tribe pursuant to the treaty of 1859, sufra, and interest on the amount which may be found due and payable to the claimant Indians. We can find no line of competent testimony in the record to justify this contention. This claim was never presented to the Interior Department, and even if it were a proper claim against the defendants and was sustained by competent proof, we can see no way by which the court could arrive at the amount which might be due and render a judgment therefor. Furthermore, it is contended by defendant’s counsel that there are not now and never were any funds in the Treasury derived from the cession of these lands, the money having been used according to the terms of the treaty in the payment of the debts of the Sac and Fox tribe of Indians. The treaty provided that all Indians absent from the tribe might return and participate in the *305 benefits of its provisions. There is no competent proof in the record to enlighten the court as to the number of Indians who abandoned the tribe from 1855 to 1867, or how many returned during that period and participated in the distribution of the tribal funds, or how many finally returned to the Oklahoma reservation and thereafter became permanent members of the tribe. In the absence of proof to the contrary, it is only just to assume that those who did not return to the tribe until 1862 shared in the benefits of the treaty of 1859, and as no proper effort has been made by claimants to show who the Indians were that had returned to Iowa prior to 1859, and what, if any, relationship, legal or otherwise, they bear to the claimants in this case, no allowance can be made.
Furthermore, the Supreme Court has decided that there is no vested interest in unallotted tribal lands and undistributed tribal funds. As was said in the case of Stephens v. The Cherokee Nation (174 U. S., 445), “ * * * the lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms.” The same principle was laid down in Wallace v. Adams (143 Fed. R., 716), which was subsequently affirmed by the Supreme Court (204 U. S., 415).
From what we have said above there can be no allowance to claimants on this branch of the case.
The claimants’ motion to amend findings is allowed in part and overruled in part. The former findings are withdrawn and new findings this day filed in lieu thereof. Judgment to stand.