## Chesapeake & Ohio Railway Co. v. Morton.

(Decided April 18, 1911.)

### Appeal from Greenup Circuit Court.

Railroad.—Freight Charges.—Connecting Carriers.—Rates Fixed by Law.—In an action by A. B. Morton against the Chesapeake & Ohio Ry. Co. to recover alleged overcharge on shipments of freight from points in Kentucky to stations on the line of the Grand Rapids & Indiana Ry. Co. Held it is immaterial to plaintiff how the items of expense are charged or divided as between the several connecting carriers, so long as they are kept within the schedule tariff rates. These rates are fixed by law and both parties are bound by them if, with the charge of the Bridge Co. added, the expense of the shipment do not exceed the tariff rates.

WORTHINGTON, COCHRAN & BROWNING for appellant.

W. J. A. RARDIN and E. E. FULLERTON for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

A. B. Morton filed an equitable action in the Greenup Circuit Court against the Chesapeake & Ohio Railway Company in which he sought to recover of said company $406.83, alleged to be overcharges on shipments of freight from points in Kentucky to certain designated stations on the line of the Grand Rapids and Indiana Railway. It is charged in the petition that the Railway Company, in violation of its contract and right, charged two cents per hundred pounds for the transferring of its case from its tracks to those of the connecting carrier at Cincinnati, and it is on this particular charge that the plaintiff seeks in its suit to recover. The railway company defends upon the ground that it made no overcharge whatever, but it simply charged the regular tariff charges as provided for in the schedules published and posted by it and its connecting carriers.

The proof shows that there is no physical connection at Cincinnati between the defendant railway company and its connecting carrier, the Panhandle, and that the freight was delivered to the Newport & Cincinnati Bridge Co., and was by it delivered to the Panhandle Railroad, and that for its services in switching or conveying the freight cars from the line of the defendant to the Panhandle and Bridge Company did make a charge of two cents per hundred pounds. If this two' cents per hundred pounds was a charge in excess of the regular tariff rates between the points, under the authority of Chesapeake & Ohio Railway Co. v. Dobbins, 65 S. W., 334, plaintiff would clearly be entitled to recover. But it is insisted by the appellant company that this two cents per hundred pounds, though charged by the bridge company, was not made as an additional charge to the regular schedule tariff, but, under a traffic agreement between the two roads, was borne by the receiving carrier, and deducted from its portion of the schedule tariff rate.

The trial judge, upon proof, was of opinion that it was a charge in addition to the regular tariff rate, and entered judgment for the plaintiff accordingly. From that judgment the railway company prosecutes this appeal, and seeks a reversal upon the ground that the evidence does not support the finding of the chancellor.

The bridge company charged and received two cents per hundred pounds for transferring the freight, and if this charge was added to the schedule tariff and paid by plaintiff, the judgment of the lower court should be upheld. But, though charged by the bridge company, if it was paid by the connecting carrier and deducted from its schedule tariff rate for carrying this freight, then no ground of complaint is afforded plaintiff, and the judgment should be reversed. The railroads were bound to charge the schedule tariff rate for these shipments. They could charge neither more nor less. C. & O. Ry. Co. v. Maysville Brick Co., 116 S. W., 1183; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S., 425. What were these rates? It is admitted that during a part of the time covered by these shipments the rate to Cincinnati, Ohio, was 8 1-2c per tie, and that thirteen cars were shipped under this rate; that the rate was thereafter changed and a charge of 5 1-2c per hundred pounds was made, and that twenty-one cars were shipped under this rate. There is no contrariety in the testimony as to

the correctness of these rates or the number of cars shipped thereunder. The rate on the Panhandle and G. R. & I from Cincinnati to Richmond, Indiana, is 6c per hundred pounds, and from Cincinnati to Grand Rapids and Muskegon, 12c per hundred pounds. There is no dispute in the evidence that these were the joint tariff rates of the Panhandle and the G. R. & I. from Cincinnati to the points indicated, and the tariff sheets showing these tariff rates were posted as directed by law and filed with the Interstate Commerce Commission. These rates being fixed by law and both parties being bound by them, if with the charge of the bridge company added the expense of the shipment do not exceed the tariff rates, the plaintiff must lose; this question of fact must be determined from the evidence. It is shown by the testimony that E. H. Adams, chief clerk of the Panhandle, and W. B. Cullen, chief clerk of the Chesapeake & Ohio, that there was a traffic agreement or arrangement between the two roads whereby the receiving road would pay or absorb the transfer or bridge charge on all local shipments; that is, if the shipment originated on the Chesapeake & Ohio and was destined for a point on the Panhandle or its connecting road, the bridge toll would be paid by the Panhandle, and if the shipment originated on the line of the Panhandle and was destined for delivery at a point on the Chesapeake & Ohio, the latter would pay the bridge toll. Was this arrangement carried into effect as to the shipments involved in this suit?

An examination of the expense bills of the cars that were shipped to Richmond, Indiana, shows that the freight charge was divided, as follows: 4 cents, 2 cents and 5 1-2 cents, making a total of 11 1-2 cents. At that time the tariff rate on the Chesapeake & Ohio was 5 1-2c and on the Panhandle 6c, making the joint tariff rate 11 1-2c, the exact amount charged. It is explained that the 6c for the Panhandle was divided into 4c and 2c, the Panhandle retaining the 4c and paying the 2c to the bridge company, in accordance with the traffic agreement testified to as then existing between the railroad companies. The expense bills covering shipments to Grand Rapids and Muskegon show that the items of expense are charged therein, as follows: 7 8-10c. 2 2-10c and 2c, thus making 12c, the tariff rate from Cincinnati to these points. To this is added the tariff rate on the Chesapeake & Ohio, which part of the

time was 8 1-2c per tie and the balance of the time 5 1-2c per hundred pounds. So that the expense bills on file show conclusively that, while the 2c per hundred pounds was charged by the bridge company, it was deducted from that portion of the freight charges going to the Panhandle, and hence in nowise increased or added to the cost of the shipment so far as plaintiff was concerned. It is immaterial to plaintiff how these items of expense are charged or divided as between the several connecting carriers so long as they are kept within the schedule tariff. The evidence shows beyond question that the bridge company's charges were absorbed by the Panhandle, and deducted from the items of expense which it was authorized to charge under its tariff rate. Hence, this 2c per hundred pounds added nothing to the expense of the shipment so far as plaintiff was concerned.

Judgment reversed and cause remanded, with instructions to enter a judgment for the defendant.