A. D. Rahming v. James Mackey

187 So. 579.
Division B.
Opinion Filed March 17, 1939.

*S. J. Barco* and *Zewadski & Pierce,* for Appellant;
*Clarence W. Nelson,* for Appellee.

Chapman, J.—On June 15, 1935, Josephine Poitier filed a petition in the County Judge's Court of Dade County, Florida, praying for the issuance of Letters of Administration on the Estate of Ethel Baker, who died, intestate, in Dade County, Florida, on June 3, 1935, and left heirs at law and next of kin, viz.: Josephine Poitier, Flossie Hamilton, Julia Thomas, and George Mackey. The estimated value of the Estate of Ethel Baker was placed at the sum of $2,000.00. In the absence of the Honorable W. F. Blanton, County Judge, a Judge of the Circuit Court issued to Josephine Poitier Letters of Administration upon the Estate of Ethel Baker, deceased.

On February 8, 1936, A. D. Rahming filed in the County Judge's Court of Dade County, Florida, his petition for the removal of Josephine Poitier, as Administratrix, and

prayed for an order appointing him as Administrator, and alleged that he was the father of the deceased, Ethel Baker, who died without issue, and that as the sole heir, under the statutes of Florida, he was as a matter of law entitled to the appointment as Administrator. An answer, on March 8, 1936, was filed by Josephine Poitier to the petition of A. D. Rahming in which she denied that A. H. Rahming was next of kin and heir at law of the deceased, Ethel Baker, but that he was an imposter without any right, claim or interest in and to said estate.

On May 5, 1936, the Honorable W. F. Blanton, Judge, *supra,* after hearing considerable evidence offered by the respective parties on the issues made by the pleadings, on May 20, 1936, entered an order for the removal of Josephine Poitier as Administratrix and appointed A. D. Rahming as Administrator, and held further: (1) that A. D. Rahming and Lena Russell, mother of Ethel Baker, deceased, were married in Key West, Monroe County, Florida, during the year 1886; (2) that the late Ethel Rahming Baker was an issue of said marriage and died without issue on June 3, 1935; (3) that A. D. Rahming was the next of kin and heir at law of Ethel Baker, deceased, and had preference under the statute to be appointed Administrator as against Josephine Poitier, Julia Thomas, George Mackey, and Flossie Hamilton.

On July 17, 1936, James Mackey filed his petition in the County Judge's Court of Dade County, Florida, for the removal of A. D. Rahming as administrator and alleging that he, James Mackey, was the first born of the marriage of Lena Russell Mackey and James Mackey, deceased, and a full brother and heir at law of Ethel Baker, deceased. Honorable W. F. Blanton, on October 28, 1936, sustained a motion to strike the petition of James Mackey for the re-

moval of A. H. Rahming as Administrator, but vacated the order at a subsequent date.

On December 9, 1936, James Mackey filed in the County Judge's Court of Dade County, Florida, his petition for the determination of heirs at law of the late Ethel Baker, and on the 9th day of February, 1937, the Honorable W. F. Blanton denied the petition of James Mackey for the determination of heirs of the late Ethel Baker, and an appeal was taken therefrom to the Circuit Court of Dade County, Florida, and on March 2, 1937, the Honorable Paul D. Barns, Circuit Judge, heard the cause and made and entered an order reversing the order denying the petition by James Mackey for a determination of the lawful heirs of the late Ethel Baker and directed further proceedings later to be had and held in the County Judge's Court of Dade County, Florida, to determine from the petition of James Mackey as to who were the heirs at law of the late Ethel Baker.

On April 21, 1937, evidence was by the Honorable W. F. Blanton taken on the issues contained in the petition of James Mackey as directed by the Circuit Court of Dade County, Florida, and after hearing all the evidence and counsel for the parties, on the 5th day of June, 1937, held: (1) that James Mackey, petitioner, was an heir at law of Ethel Baker, deceased, being the oldest child of James Mackey, Sr., and Lena Russell Mackey, deceased; (2) that the petitioner, James Mackey, is a full blood brother of Ethel Baker, deceased; (3) that Ethel Baker, deceased, left next of kin and heirs at law brothers and sisters, viz.: James Mackey, Julia Thomas, Josephine Poitier, Flossie Hamilton, and George Mackey; (4) that A. D. Rahming should be and was removed as Administrator of the Estate of Ethel Baker, deceased, and Josephine Poitier appointed in his stead.

An appeal was taken from said order and the same was

on the 10th day of September, 1937, affirmed by the Circuit Judge of Dade County, Florida. An appeal was taken to this Court from said order of affirmance as made and entered by the Circuit Court of Dade County, and the same is here for review on several assignments of error.

It is conceded on the record here that an order now exists in the County Judge's Court of Dade County, Florida, adjudicating and holding that A. D. Rahming is the father and heir of Ethel Baker, deceased, as against Josephine Poitier, Julia Thomas, George Mackey and Flossie Hamilton, and that an appeal has never been taken therefrom. Likewise the order reviewed here holds that James Mackey is a full brother of the late Ethel Baker and is entitled to inherit the estate of Ethel Baker, as against A. D. Rahming, and that James Mackey's full brother and sisters are not heirs and cannot participate in the distribution thereof. It presents not only an anomalous situation, but the inconsistences of these two orders cannot be harmonized. James Mackey should not, as a matter of law, be allowed to inherit a part of this estate if his brother and sisters cannot; or to put it differently; if James Mackey inherits, likewise his full brother and sisters, viz.: George Mackey, Josephine Poitier, Julia Thomas and Flossie Hamilton should inherit. A distinction should not exist as between the full brothers and sisters now before the Court.

The County Judge's Court in holding that James Mackey was a brother of the late Ethel Baker and, as an heir at law was entitled to a portion of the Ethel Baker estate, based his order exclusively on the evidence taken on the petition to determine the heirs at law of Ethel Baker, deceased, pursuant to the mandate of the Circuit Court, and no part of the testimony then pending in his office taken in the former hearing was considered in the hearing on the petition of James Mackey. Counsel for Rahming contended

that the County Judge's Court should have considered the evidence taken in former proceedings, but under the mandate of the Circuit Court the County Judge's Court declined or refused so to do, hence the reason for the anomalous situation here. Counsel for Rahming argued it was wholly unnecessary to bring these witnesses to the James Mackey hearing when their testimony was then before the Court on the Rahming hearing.

Section 46 of Chapter 16103, Acts of 1933, Laws of Florida, commonly known as the Probate Act, provides the form of citation and service in all matters pertaining to probate jurisdiction of the County Judge's Court where process is necessary, or ordered by the County Judge. Likewise Section 182 of Chapter 16103, *supra,* gives the County Judge's Court power to determine the heirs of decedents when property shall pass by the laws of descent and distribution.

When James Mackey was on the stand in his own behalf, in the proceeding to determine the heirs of Ethel Baker, on cross examination he stated that he lived in Chicago and learned of Ethel Baker's death shortly after she was killed, in a letter from Josephine Poitier; that she wrote him about Ethel's estate. It is clear that petitioner James Mackey had knowledge of the Court proceeding had in the County Judge's Court of Dade County, Florida, on the petition of A. D. Rahming against his brother and sisters as shown by his testimony, viz.:

"Q. When was the first time you ever heard about this case?

"A. I heard about this case over a year ago.

"Q. Longer than that, wasn't it?

"A. I don't know, it may be; something like that, anyhow.

"Q. Who did you hear it from at that time?

"A. Nobody but my young sister, Josephine.

"Q. When did you hear about it next?

"A. No, sir, I — — — —.

"Q. You heard about it from Josephine a year ago—when was the next time you heard about the case? Did she write you before we had the other hearing—write you about the other hearing and tell you about going into Court?

"A. Yes, sir.

"Q. That it was in court or trying to get it in Court?

"A. Yes, sir. I thought it was such a good case that I didn't have to come down. Like they said, I didn't know anything about no other father.

"Q. You didn't think there was any use of you coming down to that hearing and you just left it to them to handle?

"A. Yes, sir.

"Q. Then, after the hearing was over, they wrote you about it again, I suppose.

"A. Yes, sir.

"Q. What did they say then?

"A. They practically told me, everything was tied up, and asked me once or twice, can I come down, and I told them, that I didn't want to come down at the present time, I didn't have no money and things going practically bad with me, no more than a living with me, and that I was trying to get a job and different things.

"Q. What did they want you to come down here for, to start this proceeding?

"A. To come down to be a witness on the case if it come up again. In fact, I had been away practically so long and they hadn't seen me, they just wanted to see me.

"Q. Just loved you so much, they wanted to see you?

"A. I guess so.

"Q. They wrote you about coming down to be a witness on the case, did they?

"A. Yes, sir.

"Q. What else did they say about that?

"A. Well, nothing particular concerning any family outside affairs, not concerning the Court.

"Q. What did they say about your coming to be a witness in the case if it came up again?

"A. Well, they didn't say anything; just told me, if the case come up again if I could make my appearance and come down and they would send for me.

"Q. They sent you the money to come down here?

"A. Yes, sir, I didn't have any money to come down; just barely living in Chicago cause the times got so tough with me.

"Q. You got in Miami Monday morning?

"A. Got in Miami on Monday morning.

"Q. And you left Chicago Friday night?

"A. Yes, sir.

"Q. Who else besides Josephine ever wrote you about this case, anybody?

"A. I got a letter once from a lawyer.

"Q. What lawyer—Mr. Flaherty?

"A. Yes, Mr. Flaherty was the gentleman; his name was hard I couldn't think of it.

"Q. When did you receive that letter?

"A. That was awhile back; I can't exactly place the date of that.

"Q. Was that before or after Josephine wrote you that they were going to Court with the case?

"A. I just can't remember what it was, before or after the case. I know it was before the case was coming off, along in that time. I can't recall whether before or after.

"Q. You and your sisters knew that the case would be coming up shortly?

"A. Yes, they wrote me; made us all know.

"Q. As a matter of fact, it was after that case that Mr. Flaherty wrote you, or was it before?

"A. I just could not recall whether before or after. I would not be positive.

"Q. What did Mr. Flaherty say to you in that letter?

"A. Said the case was coming up, he would like for me if I could to come down, and I told him, I couldn't make it, I couldn't come down.

"Q. You knew that Mr. Flaherty was the lawyer handling the case for your sisters and the rest of the estate?

"A. It was his name on the envelope.

"Q. Being an intelligent man you knew that would be true?

"A. It could have come from most anybody.

"Q. So far as you were concerned, you were satisfied with Mr. Flaherty, weren't you?

"A. Yes, sir. In fact, I was satisfied with the whole case, leaving it up to my sisters to try to straighten it out.

"Q. Whatever developed you would be satisfied with, whatever way they handled it?

"A. Yes, sir, anything they did."

Likewise Josephine Poitier testified that she wrote her brother, James Mackey, about the death of Ethel Baker the record shows:

"Q. When did you write him?

"A. Good-while after; not right after my sister's death.

"Q. About how long is a good-while, Josephine?

"A. What did you say?

"Q. How long was it after Ethel's death, month or 6 weeks, or what?

"A.  It was about, the first time I remember, around about 8 weeks when I wrote him, that I can remember.

"Q.  Did he reply to that letter?

"A.  Yes, he answered my letter.

"Q.  How long after you had written him?

"A.  He didn't answer my letter right away; went somewhere; around during Christmas time when he answered my letter.

"Q.  After your sister died?

"A.  He didn't answer it right away.

"Q.  She died in June and you wrote him 8 weeks after her death and he somewheres around the holidays answered it?

"A.  Yes, sir.

"Q.  How did you know where to write him, Josephine, —you knew his address right along?

"A.  I had his address, and then I wrote there, and then I wrote a friend of his in Chicago, and when we didn't hear from him we write to the other friend, who stayed at the same place, and this man tells us whether he is in town or not.

"Q.  You had his address and also had the name of a friend so you could find out whether your brother was out of town?

"A.  Yes, sir.

"Q.  That existed over a period of years,—you knew how to write him before and then he had this friend where you could write?

"A.  Yes, sir.

"Q.  You had known his address and the friend's address?

"A.  I didn't know the friend's; I got that through another lady who lived in Palm Beach; I didn't know the friend; never had seen him.

"Q. You had his name several years before Ethel's death?

"A. No, sir, not several years before Ethel's death I didn't know the friend's name. I write my brother and if he isn't there, write his friend and he will tell me where he is.

"Q. Just after Ethel's death, about 8 weeks after her death, you wrote your brother?

"A. Yes, sir, about 8 weeks after her death, because I stayed down here a long time after Ethel's death.

"Q. After this hearing that was held sometime last year, did you again communicate with your brother?

"A. Yes, I wrote and told him about the trial.

"Q. And the outcome?

"A. Yes, sir.

"Q. And what else did you write to him, Josephine?

"A. That is all I remember, except telling him about the trial and things.

"Q. When was the first time you heard anything about this hearing that is being held today?

"A. I got a letter from my attorney once, and he said, the case would be 10 o'clock. (pausing) I could tell better by looking.

"Q. Have you got that letter with you?

"A. I don't think I have it. I think it is out to the house in colored town.

"Q. What did he tell you?

"A. He told me, to come on down to the hearing, it would be 10 o'clock.

"Q. Who from, Mr. Nelson or Mr. Flaherty?

"A. Mr. Nelson.

"Q. He is your attorney?

"A. Yes, sir.

"Q. Representing you in this matter?

"A. Yes, sir.

"Q. Did Mr. Nelson ever tell you, that if your brother would come in that this matter could be opened up and another hearing obtained?

"MR. NELSON: Your Honor, please, I object to any further questioning along this line because it is — — — —.

"MR. BARCO: Wait a minute, I will let you state your objection when this witness leaves the room.

"THE COURT: Step outside until Counsel are through with their argument.

"(Witness excused from court room.)

"MR. NELSON: I object to any further questioning along this line because it goes into a confidential relation between attorney and client, and has no relevancy to the issues in this case. * * *

"(Argument off the record.)

"MR. NELSON: I object further to the question because it has nothing to do with any cross or direct-examination.

"THE COURT: Objection sustained.

"(Witness returns to court room.)

"Q. Josephine, is it or is it not a fact, that at a former hearing of this case, you denied knowing where your brother was, and in testifying under oath in a former hearing of this case? Isn't it true and a fact, that you denied you knew where your brother was prior to the hearing?

"A. I said, when Ethel died right away I didn't know; after 8 weeks I wrote my brother. I didn't know whether he was still in Chicago or not. We had that address at Chicago 7 years. I met this other friend 8 weeks after her death.

"Q. You deny that you testified at a former hearing of this case, that you did not know where your brother was?

"A.   I didn't know right then.   I knew he was in Chicago, but whether he was in Chicago I didn't know and I had to write to see 8 weeks after.

"Q.   Did you testify at the former hearing, you didn't know where he was?

"A.   I didn't know right then where he was when Ethel died.   If I had known where he was when Ethel died, I could have wired him.

"Q.   If you knew what his address had been for 7 years prior to Ethel's death, why didn't you list him as an heir when you filed the application for appointment as Administratrix?

"A.   The insurance man said, he wanted all the brothers and sisters' names before we could get that money, and he came out to the house.   I knowed James wasn't in town and that is the reason why I signed that way.   The other paper I had to send to Atlanta, and signed James' name on the one sent to Atlanta.   I didn't mean to hide him from the estate.   Insurance man said it wasn't necessary. * * * "

The question for decision here is:   Is James Mackey, as a brother of George Mackey, Josephine Poitier, Flossie, Hamilton and Julia Thomas, bound, although not a formal party thereto, by the judgment entered by the County Judge's Court of Dade County, Florida, on May 20, 1936, holding that A. D. Rahming and Lena Russell were married at Key West, Florida, during the year 1886, and that Ethel Rahming Baker was an issue of said marriage?

Counsel for appellee contend that this exact question has been settled by this Court in McGregor v. Provident Trust Co., 119 Fla. 718, 162 So. 232; Ryan Furniture Exchange, Inc., v. McNair, 120 Fla. 109, 162 So. 483; Pitts v. Pitts, 120 Fla. 363, 162 So. 708, and other authorities cited in their brief, while counsel for appellant contend that the

question here has never been decided by this Court, and cite the case of Weberpals v. Jenny, 300 Ill. 145, 133 N. E. 62, to the effect that the doctrine of representation will estop James Mackey from maintaining his petition to determine the heirs of Ethel Baker, because he was bound through his brother and sisters on the Rahming adjudication dated May 20, 1936. The Illinois Court said:

"It is unquestionably a general rule that in proceedings in equity the interests of parties not before the court will not be bound by the decree. This rule is subject, however, to certain well-recognized exceptions, among which is one growing out of convenience or necessity in the administration of justice, which has given rise to what is known as the doctrine of representation. Where it appears that a particular party, though not before the court in person, is so far represented by others that his interests receive actual and efficient protection, the decree may be held to be binding upon him. It must appear that he stands in the same situation as parties before the court, and that he has a common right or interest with them, the operation and protection of which will be for the common benefit of all and cannot be to the injury of any. In order to apply the doctrine there must be some persons present who, with reference to the interests in question, are equally certain to bring forward the entire merits of the question, for the reason that the object is satisfied for which the presence of the actual owner would be required. This doctrine is especially applicable where persons not before the court are only possible parties not *in esse,* and where the interests of all parties *in esse* require a decree which will completely and finally dispose of the subject-matter of the litigation. Such possible parties cannot, as a matter of course, be brought before the court in person, and it would be highly inconvenient and unjust that the rights of all parties in

being should be required to await the possible birth of new claimants until the possibility of such birth has become extinct. If persons in being are before the court who have the same interests, and are equally certain to bring forward the entire merits of the question, and thus give such interests effective protection, the dictates of both convenience and justice require that there should be a complete decree. For a full discussion of this doctrine we refer to the opinions filed in Hale v. Hale, 146 Ill. 227, 33 N. E. 858, 20 L. R. A. 257, McCampbell v. Mason, 151 Ill. 500, 38 N. E. 672, and Gavin v. Curtin, 171 Ill. 640, 49 N. E. 523, 40 L. R. A. 776."

The Probate Courts of the State of California, pursuant to the Code of Civil Procedure, have the power to determine the heirs and title and ownership of property controlled by the law of descent. In the case of In re Clark's Estate, 190 Cal. 354, 212 Pac. 622, the issue to be settled was: In whom was the title and ownership of the property in controversy at the time of the death of Frank Clark? The Court had entered a judgment to the effect that the property at the time of the death of Frank Clark was the separate property of Margaret T. Clark, since deceased. In the action the judgment was binding not only on the Administrator who prosecuted the action, but upon the heirs as well of the intestate Frank E. Clark. The Administrator represented the title which the deceased, Frank E. Clark, held at the time of his death and the judgment entered included not only the adverse parties but also those claiming under the title which he represented. It further said:

"That judgment is binding, not only in proceedings upon the same, but also upon a different cause of action in so far as it settles and determines questions of fact. 23 Cyc. 1288-1290. It is well settled that a judgment or decree

necessarily affirming the existence of any fact is conclusive upon the parties or their privies whenever the existence of that fact is again in issue between them, not only when the subject-matter is the same, but when the point comes incidentally in question in relation to a different matter in the same or any other court. Freeman on Judgments, Pars. 249 and 253; Lamb v. Wahlenmailer, 144 Cal. 91, 77 Pac. 765, 103 Am. St. Rep. 66; Reed v. Cross, 116 Cal. 473, 484, 48 Pac. 491; Atchison, T. & S. F. Ry. v. Nelson, 220 Fed. 53, 135 C. C. A. 621. That is to say, 'a matter of fact once adjudicated by a court of competent jurisdiction, concurrent or exclusive, may be relied upon as an estoppel in any subsequent collateral suit in the same or any other court, at law, in chancery, in probate or in admiralty, when either party, or the privies of either party, allege anything inconsistent with it, and this too whether the subsequent suit is upon the same or a different cause of action. The facts decided in the first suit cannot be disputed." Bigelow on Estoppel, pp. 110, 111, 112 Rauer v. Rynd, 27 Cal. App. 556, 150 Pac. 780."

The case of McClellant v. Rose, 247 Fed. 721, was a suit wherein a party was not named or made a party defendant in an equity suit, but other members of a representative class were joined to which the omitted party defendant was a member and in this manner was represented as a defendant but was not a formal party. The court said:

"From the fact that one's name does not appear as a party to a suit in equity, it does not necessarily follow that he is not bound by the result of it. There are cases involving a subject-matter common to a number of individuals in which some only of such individuals, who in fact are representatives of the entire class of which they are members, may be permitted to sue or defend for all, with the result of making the judgment or decree rendered binding

upon all having the common interest the same as if all were before the court.

"Hartford Life Ins. Co., v. Ibs., 237 U. S. 662, 672, 35 Sup. Ct. 692, 59 L. Ed. 1165, L. R. A. 1916A, 765; Wallace v. Adams, 204 U. S. 415, 27 Sup. Ct. 363, 51 L. Ed. 547; Smith v. Swormstedt, 16 How. 288, 14 L. Ed. 942; Mandeville v. Riggs, 2 Pet. 482, 487, 7 L. Ed. 493; Hale v. Hale, 146 Ill. 227, 258, 33 N. E. 858, 20 L. R. A. 247; Society of Shakers v. Watson, 68 Fed. 730, 15 C. C. A. 632; Stevens v. Smith, 126 Fed. 706, 61 C. C. A. 624 Equity Rule 38 (198 Fed. xxix, 115 C. C. A. xxix.).

"In order for a judgment or decree in a suit to be binding upon others than those who are brought before the court, it should be made to appear from the record in the case that such a result is contemplated; that there are persons not before the court having an interest in common with those who sue or defend, and why such others are not brought in; and, further, the relation to the subject-matter of the suit of those who sue or defend for others as well as themselves should be so disclosed as to present for the determination of the court the question whether they do or do not properly represent, not only themselves, but others not before the court, who are similarly concerned in the issue they raise or contest. McArthur v. Scott, 113 U. S. 340, 395, 5 Sup. Ct. 652, 28 L. Ed. 1015; American Steel & Wire Co. v. Wire Drawers', etc., Union (C. C.), 90 Fed. 598, 606, 607; 1 Street's Federal Practice, par. 543. * * * "

See Stewart v. Oneal, 237 Fed. 897, 50 C. J., par. 4, page 408.

It appears that James Mackey, acting through his brother and sisters in the first hearing or proceeding in the County Judge's Court, had a full knowledge thereof and in harmony with the authorities above cited, was no doubt bound thereby, but as an appeal was never taken from said former

order and confusion appears to have existed as to the construction or interpretation of the order of reversal entered by the Circuit Court of Dade County, Florida, and the evidence taken in the first hearing was considered by the court when the second order was entered, we think the County Judge's Court should have considered *all* the evidence then pending before the court throwing any light whatsoever on the question as to the heirs of Ethel Baker, deceased.

The order appealed from is reversed with directions to the County Judge's Court of Dade County, Florida, to consider *all* the evidence taken before him upon different occasions and to hear and receive such additional evidence as may be offered by the respective parties, if any, and from all the testimony then before him, determine the heirs of the late Ethel Baker.

It is so ordered.

WHITFIELD, P. J., and BROWN, J., concur.

BUFORD, J., concurs in the opinion and judgment.

Justices TERRELL and THOMAS, not participating as authorized by Section 4687 Compiled General Laws of 1927 and Rule 21-A of the Rules of this Court.