NORMAN A. COCKE, WILBURT C. DAVIDSON, DORIS DUKE, BENJAMIN F. FEW, BENNETTE E. GEER, PHILIP B. HEARTT, THOMAS F. HILL, AMOS R. KEARNS, THOMAS L. PERKINS, MARSHALL I. PICKENS, R. GRADY RANKIN, WATSON S. RANKIN, W. S. O'B. ROBINSON, JR., MARY D. B. T. SEMANS AND KENNETH C. TOWE, AS TRUSTEES OF THE DUKE ENDOWMENT, A TRUST ESTABLISHED BY JAMES B. DUKE BY INDENTURE DATED DECEMBER 11, 1924 v. DUKE UNIVERSITY, THE TRUSTEES OF DAVIDSON COLLEGE; FURMAN UNIVERSITY; JOHNSON C. SMITH UNIVERSITY, INCORPORATED; CABARRUS MEMORIAL HOSPITAL, A CORPORATION, AND GREENVILLE GENERAL HOSPITAL, A CORPORATION, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASS OF HOSPITALS SIMILARLY SITUATED; BAPTIST CHILDREN'S HOME OF NORTH CAROLINA, INC., A CORPORATION, AND EPWORTH CHILDREN'S HOME, A CORPORATION, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASS OF CHILD-CARING INSTITUTION SIMILARLY SITUATED; QUARTERLY CONFERENCE OF DUKE'S CHAPEL METHODIST CHURCH, AN UNINCORPORATED ASSOCIATION, AND QUARTERLY CONFERENCE OF HILL'S CHAPEL METHODIST CHURCH, AN UNINCORPORATED ASSOCIATION, INDIVIDUALLY AND AS REPRESENTATIVES OF THE CLASS OF RURAL CHURCHES SIMILARLY SITUATED; REV. LOY D. THOMPSON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF SUPERANNUATED PREACHERS SIMILARLY SITUATED; MARY JANE WALTON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF WIDOWS OF METHODIST MINISTERS SIMILARLY SITUATED; PATRICIA JANE WALTON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF ORPHANS OF METHODIST MINISTERS SIMILARLY SITUATED; HONORABLE WADE BRUTON, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA; HONORABLE DAN McLEOD, ATTORNEY GENERAL OF THE STATE OF SOUTH CAROLINA; NORTH

CAROLINA HOSPITAL ASSOCIATION, INCORPORATED, A CORPO-
RATION; SOUTH CAROLINA HOSPITAL ASSOCIATION, A CORPORATION;
NORTH CAROLINA ASSOCIATION OF CHILD-CARING INSTITU-
TIONS, AN UNINCORPORATED ASSOCIATION; NORTH CAROLINA ANNU-
AL CONFERENCE OF THE METHODIST CHURCH, SOUTHEASTERN
JURISDICTION, AN UNINCORPORATED ASSOCIATION; WESTERN NORTH
CAROLINA ANNUAL CONFERENCE OF THE METHODIST CHURCH,
SOUTHEASTERN JURISDICTION, AN UNINCORPORATED ASSOCIATION; JOHN
S. CANSLER, AS GUARDIAN AD LITEM FOR ALL MINORS, UNBORN PERSONS,
UNKNOWN PERSONS, CORPORATIONS, ASSOCIATIONS AND ENTITIES, AND ALL
OTHER PERSONS, CORPORATIONS, ASSOCIATIONS AND ENTITIES, WHETHER
NOW IN BEING OR HEREAFTER COMING INTO BEING WHICH MAY NOW HAVE
OR MIGHT HEREAFTER ACQUIRE AN INTEREST, WHETHER VESTED OR CONTIN-
GENT, IN THE SUBJECT MATTER REFERRED TO IN THE COMPLAINT IN THIS AC-
TION OR ANY INTEREST UNDER THE INDENTURE OF TRUST DESCRIBED IN THE
COMPLAINT IN SAID ACTION AND WHO ARE NOT REPRESENTED BY REPRESENTA-
TIVES OF THEIR CLASS OR OTHERWISE; AND MARY JANE WALTON, AS
GENERAL GUARDIAN OF THE ESTATE OF THE DEFENDANT PATRICIA JANE
WALTON, A MINOR, AND AS A REPRESENTATIVE OF THE CLASS OF ORPHANS
OF METHODIST MINISTERS SIMILARLY SITUATED.

(Filed 19 July 1963.)

**1. Courts § 3—**

The Superior Court is a court of general legal and equitable juris-
diction. G.S. 7-63.

**2. Same; Courts § 20—**

Our courts have jurisdiction of an action to modify a trust when the
trust operates principally in this State, a majority of the trustees reside
here, and the trustees, pursuant to authority conferred upon them by the
trust, have established administrative offices in this State, notwithstand-
ing the trustor resided in another state and executed the instrument there,
but in determining the right to modify the trust our courts will apply
the laws of such other state.

**3. Parties § 5—**

Where the potential beneficiaries of a trust are so numerous that it
is practically impossible to bring them all before the court in an action
seeking modification of the trust, a beneficiary of each class may be made
a party and represent the class. G.S. 1-70.

**4. Trusts § 5—**

Courts of equity have jurisdiction to modify a trust indenture, but in
order to invoke such equitable power it must be made to appear that
some exigency, contingency, or emergency not anticipated by the trustor
has arisen requiring a disregard of some specific provision of the trust
in order to preserve the trust estate or protect the cestuies.

**5. Same— Evidence held insufficient to invoke power of equity to
modify trust indenture.**

The evidence disclosed that the trustor, a man of exceptional business
ability, gave a great deal of time and thought to the language of the

trust endowment created by him, and that the trust indenture provided that the trustees could invest funds of the trust only in the securities of a power company which the trustor had helped create, or in governmental or municipal bonds. The trustees instituted this action for a modification of the trust to permit them to invest in stocks and bonds of other corporations in their discretion as they deemed advisable. There was testimony by investment experts that a greater degree of diversification is advisable and recommended under general trust investment principles. *Held:* In the absence of a showing that a modification of the provisions for investment of the trust funds is necessary to preserve the *corpus* of the trust or protect the interests of the beneficiaries, there is insufficient evidence to invoke the equitable power of the court to authorize the trustees to disregard the express provisions of the trust indenture, and nonsuit should have been entered.

HIGGINS, J., concurring.

APPEAL by John S. Cansler, guardian *ad litem*, and Mary Jane Walton, individually and as general guardian for Patricia Jane Walton, from *Campbell, J.*, December 10, 1962 Special Civil Term of MECKLENBURG.

On 11 December 1924 James B. Duke, a resident of New Jersey, transferred in trust to twelve named individuals 122,647 shares of Duke Power Co., 100,000 shares of British-American Tobacco Co., Ltd., 75,000 shares of R. J. Reynolds Tobacco Co. B stock, 5,000 shares of George W. Helme Co., 12,325 shares of Republic Cotton Mills, and 7,935 3/10 shares of Judson Mills to be by them and their successors held in trust for the uses and purposes set out in a trust indenture of that date executed by Mr. Duke and the twelve named trustees.

The trust then created is by the indenture denominated "the Duke Endowment." It has perpetual existence and is governed by a self-perpetuating board of fifteen members. It gives blanket authority to the trustees to sell any stocks except shares of Duke Power Co. As to the shares of that corporation and its subsidiaries, no sale can be made "except upon and by the affirmative vote of the total authorized number of trustees at a meeting called for the purpose, the minutes of which shall state the reasons for and terms of such sale."

The motives prompting the creation of the trust and its general purposes are detailed in the seventh division of the indenture in this language:

"For many years I have been engaged in the development of water powers in certain sections of the States of North Carolina and South Carolina. In my study of this subject I have observed how such utilization of a natural resource, which otherwise would run in waste to the sea and not remain and increase as a forest, both gives impetus

COCKE *v.* DUKE UNIVERSITY.

to industrial life and provides a safe and enduring investment for capital. My ambition is that the revenues of such developments shall administer to the social welfare, as the operation of such developments is administering to the economic welfare, of the communities which they serve. With these views in mind I recommend the securities of the Southern Power System (the Duke Power Company and its subsidiary companies) as the prime investment for the funds of this trust; and I advise the trustees that they do not change any such investment except in response to the most urgent and extraordinary necessity; and I request the trustees to see to it that at all times these companies be managed and operated by the men best qualified for such a service.

"I have selected Duke University as one of the principal objects of this trust because I recognize that education, when conducted along sane and practical, as opposed to dogmatic and theoretical, lines, is, next to religion, the greatest civilizing influence. I request that this institution secure for its officers, trustees and faculty men of such outstanding character, ability and vision as will insure its attaining and maintaining a place of real leadership in the educational world, and that great care and discrimination be exercised in admitting as students only those whose previous record shows a character, determination and application evincing a wholesome and real ambition for life. And I advise that the courses at this institution be arranged, first, with special reference to the training of preachers, teachers, lawyers and physicians, because these are most in the public eye, and by precept and example can do most to uplift mankind, and, second, to instruction in chemistry, economics and history, especially the lives of the great of earth, because I believe that such subjects will most help to develop our resources, increase our wisdom and promote human happiness.

"I have selected hospitals as another of the principal objects of this trust because I recognize that they have become indispensable institutions, not only by way of ministering to the comfort of the sick but in increasing the efficiency of mankind and prolonging human life. The advance in the science of medicine growing out of discoveries, such as in the field of bacteriology, chemistry and physics, and growing out of inventions such as the X-ray apparatus, make hospital facilities essential for obtaining the best results in the practice of medicine and surgery. So worthy do I deem the case and so great do I deem the need that I very much hope that the people will see to it that adequate and convenient hospitals are assured in their respective communities, with especial reference to those who are unable to defray such expenses of their own.

"I have included orphans in an effort to help those who are most unable to help themselves, a worthy cause, productive of truly beneficial results in which all good citizens should have an abiding interest. While in my opinion nothing can take the place of a home and its influences, every effort should be made to safeguard and develop these wards of society.

"And, lastly, I have made provision for what I consider a very fertile and much neglected field for useful help in religious life, namely, assisting by way of support and maintenance in those cases where the head of the family through devoting his life to the religious service of his fellow men has been unable to accumulate for his declining years and for his widow and children, and assisting in the building and maintenance of churches in rural districts where the people are not able to do this properly for themselves, believing that such a pension system is a just call which will secure a better grade of service and that the men and women of these rural districts will amply respond to such assistance to them, not to mention our own Christian duty regardless of such results. Indeed, my observation and the broad expanse of our territory make me believe it is to these rural districts that we are to look in large measure for the bone and sinew of our country.

"From the foregoing it will be seen that I have endeavored to make provision in some measure for the needs of mankind along physical, mental and spiritual lines, largely confining the benefactions to those sections served by these water power developments."

By the fourth division of the indenture the trustees were authorized to expend $6,000,000 of the corpus in acquiring property and construing buildings for Duke University.

The fifth division makes provision for the use of the income from the corpus of the estate (the portion not expended in establishing Duke University plus such funds as Mr. Duke might thereafter add to the trust). The trustees are directed to set aside 20% of the net income until an additional $40,000,000 has been added to the corpus of the trust. The remaining income is payable 32% to Duke University, 32% to such nonprofit hospitals located in North Carolina and South Carolina as the trustees may select for assistance in constructing and equipping such hospitals and to help cover the cost of the treatment of the indigent, 5% to Davidson College, 5% to Furman University, 4% to Johnson C. Smith University, 10% to nonprofit organizations selected by the trustees from those in North or South Carolina which are engaged in caring for orphans, 2% for the care and maintenance of needy superannuated Methodist preachers and

widows and orphans of deceased Methodist preachers residing in North Carolina, 6% to such Methodist churches in North Carolina as the trustees might select to be used by them in erecting churches in rural areas, and 4% for the maintenance and operation of such churches.

The third division of the indenture limits the authority of the trustees with respect to investments in the following language:

"To invest any funds from time to time arising or accruing through the receipt and collection of incomes, revenues and profits, sale of properties, or otherwise, provided the said trustees may not lend the whole or any part of such funds except to said Duke Power Company, nor may said trustees invest the whole or any part of such funds except to said Duke Power Company, nor may said trustees invest the whole or any part of such funds in any property of any kind except in securities of said Duke Power Company, or of a subsidiary thereof, or in bonds validly issued by the United States of America, or by a State thereof, or by a district, county, town or city which has a population in excess of fifty thousand people according to the then last Federal census, which is located in the United States of America, which has not since 1900 defaulted in the payment of any principal or interest upon or with respect to any of its obligations, and the bonded indebtedness of which does not exceed ten per cent of its assessed values. Provided further that whenever the said trustees shall desire to invest any such funds the same shall be either lent to said Duke Power Company or invested in the securities of said Duke Power Company or of a subsidiary thereof, if and to the extent that such a loan or such securities are available upon terms and conditions satisfactory to said trustees."

This action was begun by plaintiffs, trustees, on 5 October 1962. They seek to have the court insert immediately before the proviso in the quoted portion of the third division of the trust limiting the authority of the trustees with respect to investments, the following: "or in such other securities, including common and preferred stocks, bonds and debentures of private corporations, and other property, real or personal, as said Trustees shall, in their discretion, deem advisable, without being restricted to such investments or reinvestments as are permissible for Executors or Trustees under any present or future applicable law, rule of court or court decision."

By order entered on 11 October 1962 defendant Cansler was appointed as guardian *ad litem* "for all minors, unborn persons, unknown persons, corporations, associations and entities and all other persons, corporations, associations and entities whether now in being or here-

after coming into being who may now have or might hereafter acquire an interest in the subject matter of this suit. . ."

By order entered 14 November 1962 it was found that Cabarrus Memorial Hospital and Greenville General Hospital, Baptist Children's Homes of North Carolina, Inc., and Epworth Children's Home, Quarterly Conference of Duke's Chapel Methodist Church, Quarterly Conference of Hill's Chapel Methodist Church, Rev. Loy D. Thompson, Mary Jane Walton, and Mary Jane Walton, general guardian of Patricia Jane Walton, were members of the different classes of beneficiaries named in the indenture; and the members of the several classes were so numerous that it was impracticable to bring all potential beneficiaries before the court. The court directed the named beneficiaries to represent their respective classes.

All defendants except defendant Western North Carolina Annual Conference of the Methodist Church, Southeastern Jurisdiction, answered. The answers, other than the answers of defendants Cansler and Walton, raised no issues of fact but requested the court to investigate and make appropriate orders. The answers of defendants Cansler and Walton deny some of the allegations because of lack of information. They challenge the conclusions which plaintiffs draw from the facts alleged.

After the answers were filed, defendant Cansler filed a demurrer challenging the jurisdiction of the court. The demurrer was overruled. A jury trial was waived. Judge Campbell, after hearing the evidence, made findings of fact on which he concluded plaintiffs were entitled to the relief sought. Judgment was entered giving the trustees power and authority to invest in accordance with the prayer of the complaint.

Defendants Cansler and Walton, having noted exceptions to findings and rulings, appealed.

*Lassiter, Moore and Van Allen by Robert Lassiter, Jr., and Perkins, Daniels, McCormack & Collins of counsel, for plaintiff appellees.*
*John S. Cansler and Cansler & Lockhart for defendant appellants.*

RODMAN, J.   Before considering the correctness of the judgment permitting plaintiffs, trustees, to make investments expressly prohibited by the trust indenture, we must dispose of the questions presented by the demurrer filed by defendant Cansler in the Superior Court and the demurrer filed in this Court by defendants Cansler and Walton.

For practical purposes the demurrers present these questions: (1) Does the due process clause of the Fourteenth Amendment to the Constitution of the United States forbid this Court from exercising

its equitable jurisdiction with respect to the administration of a trust which by its express language is "executed by a resident of the State of New Jersey in said State, is intended to be made, administered and given effect under and in accordance with the present existing laws and statutes of said State, notwithstanding it may be administered and the beneficiaries hereof may be located in whole or in part in other states, and the validity and construction thereof shall be determined and governed in all respects by such laws and statutes?" (2) Is the court without authority to act because it has not acquired jurisdiction of all necessary parties?

The argument made by appellants that the authority to control and supervise the administration of the trust is limited to the courts of New Jersey, because made in that state by a citizen thereof and by its terms must be interpreted and administered in accordance with the laws of that state, is lacking in merit. Appellants in their brief frankly say they "know of no controlling authority in support of the grounds of such demurrer" but believe it their duty to present the question for decision.

The general rule with respect to the interpretation of contracts was stated by Connor, J., in *Cannaday v. R.R.*, 143 N.C. 439, 55 S.E. 836. He said: "It is settled that 'Matters bearing upon the execution, interpretation and validity of a contract are determined by the law of the place where it is made.'" The statement made in the *Cannaday* case was repeated by Winborne, C.J., in *Roomy v. Ins. Co.*, 256 N.C. 318, 123 S.E. 2d 817. This rule is generally recognized. *Bundy v. Commercial Credit Co.*, 200 N.C. 511, 157 S.E. 860; 12 Am. Jur. 771; 17 C.J.S. 341.

But the rule, like most general rules, is subject to qualifications and exceptions. *Bundy v. Commercial Credit Co.*, *supra*. It has been said: "Where a contract is to be performed wholly outside the state in which the contract was made the parties are presumed to adopt the law of the place of performance as the law of the contract." *Elk River Coal & Lumber Co. v. Funk*, 271 N.W. 204, 110 A.L.R. 1415; 17 C.J.S. 342-3.

American Institute's Restatement of Conflict of Laws sec. 297 states the general rule governing the administration of an *inter vivos* trust of movables: "A trust of movables created by an instrument *inter vivos* is administered by the trustee according to the law of the state where the instrument creating the trust locates the administration of the trust." Comment "a" thereunder states: "The administration by the trustee is the action of the trustee in carrying out the duties of the trust. In what securities can he invest? What interest should he receive

on investment? To whom shall he pay the income? To whom shall he render an account? These are questions of administration and the rule stated in this Section is applicable to them." In comment "d" it says: "In order to determine where the administration of the trust is located, consideration is given to the provisions of the instrument, the residence of the trustees, the residence of the beneficiaries, the location of the property, the place where the business of the trust is to be carried on." The rule there enunciated is seemingly the law of New Jersey. *Swetland v. Swetland,* 149 A 50.

But like the rule for the interpretation of contracts the general rule in trust administration is subject to exceptions and not universally applied. *Haag v. Barnes,* 175 N.E. 2d 441, 87 A.L.R. 2d 1301; *Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A 2d 309, 139 A.L.R. 1117; *Hutchinson v. Ross,* 187 N.E. 65, 89 A.L.R. 1007; and the annotations to those cases; 11 Am. Jur. 382-3.

Here the trust agreement had each of the elements referred to in comment "d" interpreting the Restatement rule. Some of the original trustees were residents of New Jersey, others of North Carolina, South Carolina, and New York. The instrument was executed and acknowledged in New Jersey. The trustees were authorized to select places from which the trust would be administered. Doubtless the draftsman saw that controversy might arise with respect to the administration of the trust and for that reason said the laws of New Jersey should provide the rule to govern the trustees in the administration of the trust; but this declaration was not intended to vest sole control over the administration of the trust in the courts of that state. Doubtless Mr. Duke and the draftsman saw that the courts of New Jersey might not be able to exercise any jurisdiction because of the nonresidence of the trustees and beneficiaries and the lack of control over the trust assets. A court called upon to supervise the administration should have no doubt as to what law the donor intended the trustees to obey.

The Superior Courts of this State are courts of general jurisdiction, G.S. 7-63, exercising equitable powers. *Settle v. Settle,* 141 N.C. 553. They may, when all necessary parties are before the court, determine questions relating to the administration of trusts operating in this state.

There can be no doubt that this trust operates principally in this state and that this state has substantial contact with and interest in the trust. The trust instrument declares the trust was created to further the economic and social welfare of the states of North Carolina and South Carolina; donor wished the majority of the trustees to be natives of those states; the trustees have acted accordingly—nine are

residents of North Carolina, one is a resident of South Carolina, and the others live in Hawaii, New York, or Connecticut; the trustees, pursuant to the authority given them, have established their principal office in Charlotte, N. C., with another office in Durham, N. C.; the principal office of Duke Power Co., the instrumentality expected to provide the bulk of the funds to be distributed to beneficiaries of the trust, is located in Charlotte, N. C.; five of the ten annual meetings required by the trust are held in North Carolina; most of the beneficiaries of the trust have their residence and operate in this state; substantial bank accounts are maintained in this state for distribution to the beneficiaries; the books and records of the trustees are maintained in this state. No fact alleged indicates the trust presently has any connection with the state of New Jersey or that any of its assets are in that state or that any beneficiary lives in New Jersey.

The due process clause does not forbid the courts of this state from exercising jurisdiction over the trust under the facts alleged and admitted by the demurrer.

Appellant's second position is: The court lacked authority to act because all potential beneficiaries have not been personally served with process and have not voluntarily submitted themselves to the jurisdiction of the court.

All specific beneficiaries are before the court. Representatives of all classes, where no specific beneficiary is named, are before the court. The agreement authorizes the trustees to select for donations non-profit hospitals in North Carolina and South Carolina. The complaint alleges and the demurrer admits there are approximately 175 eligible hospitals in North Carolina and approximately 80 eligible hospitals in South Carolina. Cabarrus Memorial Hospital, a North Carolina corporation now a recipient of funds, and Greenville General Hospital, a South Carolina corporation now a recipient of funds, are parties and were specifically directed to represent this class of beneficiaries.

There are approximately 30 institutions in North Carolina that care for orphans and 15 such institutions in South Carolina. Defendant Baptist Children's Homes of North Carolina and Epworth Children's Home of South Carolina typify this class of beneficiaries. They were by order of court specifically directed to represent the class. There are approximately 1450 rural churches in North Carolina eligible for selection by the trustees for benefits under the trust. The Quarterly Conference of Duke's Chapel Methodist Church and the Quarterly Conference of Hill's Chapel Methodist Church are representatives of that class. There are approximately 225 superannuated preachers, any of whom might be selected to receive benefits under the trust. Defend-

ant Thompson, a citizen of North Carolina, is a representative of that class. There are approximately 240 eligible widows in North Carolina, any of whom might be selected for benefits under the trust. Defendant Mary Jane Walton typifies the class she is specifically directed to represent. She has employed counsel and challenges the right of the court to grant the relief sought. There are approximately 25 eligible orphans in North Carolina, any of whom might be selected for benefits. Defendant Patricia Jane Walton typifies that class. Thus, according to the allegations of the complaint, some 2240 individuals or associations might, under the terms of the trust, be selected by the trustees as recipients of Mr. Duke's beneficence. None of these potential beneficiaries is specifically designated. None could as a matter of right assert any claim against the trust. When and to what extent payments will be made to members of the class or to the particular class are matters left to the discretion of the trustees.

The demurrer requires us to decide whether under the facts alleged and admitted the court was powerless to act until all 2240 or more of the potential beneficiaries had in some manner submitted their person to the jurisdiction of the courts of North Carolina. To support their contention that a court of this state could not act unless and until it had acquired personal jurisdiction over each of the potential beneficiaries, appellants rely on *Hanson v. Denckla,* 357 U.S. 235, 2 L. ed. 1283, 78 S. Ct. 1228. The facts in that case are so different from the facts presented by this case that it cannot in our opinion be controlling. There the trustees, residents of another state, were not before the courts of Florida which held the trust invalid. They had not undertaken to exercise any trust authority in Florida. Here the trustees are seeking the aid of the court. A majority are residents of this state. The trust is and has been for twenty-five years engaged in business in this state. Here representatives of each class of beneficiaries are before the court.

Our statute, G.S. 1-70, provides: "When the question is one of a common or general interest of many persons, or where the parties are so numerous that it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." This statutory provision has its counterpart in Rule 23a of the Federal Civil Rules of Procedure.

Our statute and the Federal rule, promulgated with the approval of the Supreme Court of the United States, merely provide a ready means for dispatch of business. Apt illustrations of their usefulness may be found in *Mills v. Cemetery Park Corp.,* 242 N.C. 20, 86 S.E. 2d 893; *Taylor v. Ins. Co.,* 214 N.C. 770, 200 S.E. 882; *Bronson v. Ins.*

*Co.,* 85 N.C. 411; *Fox Publishing Co. v. U.S.,* 366 U.S. 683, 6 L. ed. 2d 604; *Supreme Tribe of Ben Hur v. Cauble,* 255 U.S. 356, 65 L. ed. 673; *Wallace v. Adams,* 204 U.S. 415, 51 L. ed. 547; *Advertising Special. Nat. Ass'n. v. Federal Trade Com'n.,* 238 F. 2d 108; 39 Am. Jur. 919; 67 C.J.S. 947.

Not only were the class representatives parties but North Carolina Hospital Association, South Carolina Hospital Association, North Carolina Association of Child-Caring Institutions, the Annual Conference of the North Carolina Methodist Episcopal Church, and Western North Carolina Annual Conference of the Methodist Church, Southeastern Jurisdiction were parties. Practically all of the institutional potential beneficiaries are, according to the court's findings, active participating members of these associations or organizations. The court's order made express provision for any potential beneficiaries desiring to do so, to make themselves parties to the proceeding. It is appropriate also, we think, in considering the demurrer to take note of the cautionary steps taken by the court to see that all possible beneficiaries had notice of the pendency of the action. Letters were mailed to all known potential beneficiaries of each class and notice of the institution and purpose of the action was given by publication.

The court having jurisdiction of the trust assets, the trustees, and representatives of all classes of beneficiaries, had authority to hear and decide the questions raised by the pleadings. *Ferguson v. Price,* 206 N.C. 37, 173 S.E. 1.

No one has questioned the authority of the court to grant the relief sought without making Duke Power Co. a party. We merely note its absence, finding it unnecessary because of our conclusions on the merits to decide whether it is a necessary party.

Touching the merits of the controversy the court made findings which we summarize in part and quote in part: The approximate value of the securities placed in the trust in 1924 was $40,000,000; the 122,674 shares of Duke Power Co. then given the trust had an appraised value of $29,135,280; by 30 November 1962 these shares had increased to 1,899,411 shares with a market value of $110,165,838; the trust had a net income in 1925, the first year of its operation, of $386,714.16; by 1952 its net income had increased to $5,601,951.99, and for 1961 the net income was $12,592,062.97; Mr. Duke died in 1925; he bequeathed additional funds to the trust for use by Duke University; other members of the Duke family have made gifts to the trust approximating $725,000; no restrictions are imposed on the trustees with respect to the investment of gifts to the trust other than

those made by Mr. Duke himself; as of 30 November 1962 assets of the trust restricted as to reinvestment consisted of stocks worth at market and bonds at par $471,764,417. The following is a list of the stocks and bonds then held:

| Shares | Issuer | Value |
|---|---|---|
| 6,517,550 | Duke Power Co. common | $378,017,900 |
| 2,348 | Duke Power Co. preferred | 378,028 |
| 791,040 | Aluminium Ltd. | 17,402,880 |
| 59,300 | Aluminum Co. of Am. preferred | 5,040,500 |
| 639,644 | Aluminum Co. of Am. common | 35,180,420 |
| 19,031 | Piedmont & Northern Ry. common | 2,264,689 |
| 30,000 | U. S. Tobacco Co. common | 810,000 |
| | Duke Power Co. bonds | 15,300,000 |
| | U. S. bonds and notes | 17,370,000 |

At the end of 1961 there had been added to the corpus of the trust as required by division five $15,500,000, of which approximately $1,000,000 was added in 1961. Stocks of Aluminum Co. and Aluminium Ltd. represent approximately 95% of the stock held other than stocks of Duke Power Co. The 122,647 shares of Duke Power Co. given when the trust was created represented 42 % of the voting stock of that company. The trustees now have approximately 57% of the voting stock of that company. Duke Power Co. is constructing a hydro-electric plant on Catawba River to have an initial capacity of 262,500 kw and an ultimate capacity of 350,000 kw. This will cost between $60,000,000 and $70,000,000 and will create a lake covering approximately 33,000 acres. Serious inflation has affected the economy of the United States since 1924. Consumer prices were about 70% higher in 1961 than in 1924. "(I)n recent years, the average cost per student in institutions of higher education have increased by between 7% and 8% per year, on the average, and the corresponding increase figure in respect of hospital costs per patient day has been close to 9%." The purchasing power of the dollar in 1961 was only 57% of its value in 1924. Since 1924 there has been a change in the acceptability of common stocks as an investment medium. They are now looked upon as desirable investments. "(A)ll indications are that the effects of inflation will continue for the foreseeable future and at a projected rate of between one and one and one-half per cent per year." Needs of the colleges and other beneficiaries of the trust will increase not only because of depreciation in the value of the dollar but because of expected expanded population and for that reason the number of individuals hoping to benefit by the allocation of trust funds. The

Federal debt in 1924 approximated $20 billion. Today it approximates $300 billion.

"That, in the opinion of the investment experts who testified in this proceeding, a greater degree of diversification is necessary, under general trust investment principles, than exists (a) in the holdings of the Endowment in stocks of corporations other than Duke Power Company, insofar as the percentage thereof represented by the holdings of two aluminum corporations is concerned, and (b) in the holdings of the Endowment insofar as the percentage of such holdings represented by the stock of Duke Power Company is concerned.

"That the investment experts who testified in this proceeding are of the opinion that proper safeguarding of the corpus of the Endowment requires a greater degree of diversification in the respects mentioned in the immediately preceding finding.

"That the experts in problems facing foundation trustees and trust investment matters who testified in this proceeding are of the opinion that the restrictive investment provisions set forth in the Indenture constitute a threat to the safety of the Endowment corpus.

"That the experts in problems facing foundations trustees and trusts investment matters who testified in this proceeding are of the opinion that the Endowment Trustees should have greater flexibility in investment provisions and that the need for such flexibility, as of the present time, has greatly increased from the corresponding situation in 1924 due to factors which are present in the political and economic situation which exists today as compared with 1924 and that such need is greater today than in 1924 by reason of the greatly increased size of the fund today as compared with 1924."

The court concluded: "That the circumstances in this case constitute a case of emergency arising through exigencies not contemplated by James B. Duke, the creator of the trust. . . .That a change in conditions has occurred since the creation of the Endowment and a change in conditions may be reasonably foreseen, as a result of which the objects of the trust under the Indenture may be defeated in whole or in part by the investment, or continuation of investment, of all the funds of such trust in the kinds of investments to which the plaintiffs, as Trustees, are now limited by the Indenture and the objects of such trust and the interests of all the beneficiaries thereof, whether vested or contingent, will be promoted by changing the Indenture. . ."

On the findings and conclusions the court ordered the trust be modified with authority in the trustees to invest in "common and preferred stocks, bonds and debentures of private corporations, and other property, real or personal, as said Trustees shall, in their dis-

cretion, deem advisable, without being restricted to such investments or reinvestments as are permissible for Executors or Trustees under any present or future applicable law, rule of court or court decision."

Appellants, by motion to nonsuit and by exceptions to the court's findings and conclusions, raise these questions: (1) May a court of equity authorize a trustee to ignore the provisions of the trust instrument limiting his authority with respect to the kind of securities in which he may invest? (2) If so, does the evidence offered in this case justify the exercise of that power?

Our decisions answer the first question in the affirmative. "But the power of the court should not be used to direct the trustee to depart from the express terms of the trust, except in cases of emergency or to preserve the trust estate." *Penick v. Bank*, 218 N.C. 686, 12 S.E. 2d 253. "It must be made to appear that some exigency, contingency, or emergency has arisen which makes the action of the court indispensable to the preservation of the trust and the protection of infants." *Redwine v. Clodfelter*, 226 N.C. 366, 38 S.E. 2d 203. "To invoke the jurisdiction of a court of equity the condition or emergency asserted must be one not contemplated by the testator, and which, had it been anticipated, would undoubtedly have been provided for; and in affording relief against such exigency or emergency, the court must, as far as possible, place itself in the position of the testator and do with the trust estate what the testator would have done had he anticipated the emergency. *Cutter v. Trust Co.*, 213 N.C. 686, 197 S.E. 542. It is not the province of the courts to substitute their judgment or the wishes of the beneficiaries for the judgment and wishes of the testator." *Carter v. Kempton*, 233 N.C. 1, 62 S.E. 2d 713.

Decisions of this court accord with the law of New Jersey as declared by its courts. Buchanan, V.C., said in *New Jersey National Bank & Trust Co. v. Lincoln Mortgage & Title Guaranty Co.*, 105 N.J. Eq. 557, 148 A. 713: "It is of course quite true that *ordinarily* the trustee is bound, in the administration of the trust, by the terms of the trust, and that even his (sic) court has no right to authorize the trustee to depart therefrom; but it is also true that a court of equity, in its capacity as universal trustee, may in cases of emergency, for the preservation of the trust estate and protection of the *cestuis*, authorize and direct the trustees to do acts which under the terms of the trust and under ordinary circumstances they would have no power to do. This power resides in the court of chancery as a part of its original inherent jurisdiction—its general administrative jurisdiction in cases of trusts." After citing cases in support of the foregoing statement, he adds: "It is of course recognized that the jurisdiction is one which

should not be exercised except in an emergency and then only for the preservation of the trust estate and the protection of the cestuis." *First Nat. Bk. of Jersey City v. Stevens,* 9 N.J. Super. 324; *Fidelity Ins. Co. v. United Co.,* 36 N.J. Eq. 405; *Pennington v. Metropolitan Museum of Art,* 65 N.J. Eq. 11, 55 A 468; *Price v. Long,* 87 N.J. Eq. 578, 101 A 195; *Trust Co. of N. J. v. Glunz,* 181 A 27; *Lambertville Nat. Bk. v. Bumster,* 141 N.J. Eq. 396, 57 A 2d 525.

In 1898 the legislature of New Jersey enacted a statute permitting fiduciaries to invest in bonds of the United States, bonds of the state of New Jersey or political subdivisions thereof, or bonds secured by first mortgage on real estate. These are referred to in New Jersey as "legal investments."

In 1937 the New Jersey legislature enacted a statute authorizing a trustee or a beneficiary of a trust, when an emergency arose, to apply to the chancery court for authority to invest in securities other than those designated by the statutes as "legal investments" or defined by the terms of the trust. The statute was incorporated as 3:16-17 and 3:16-18 in the Revised Statutes of New Jersey 1937—reenacted in substance in the Revised Statutes of 1951 as subsections a and b of 3A:15-15. Subsection b. of that statute now reads: "If the court shall find that by reason of a change in conditions which occurs since the creation of such trust or which may be reasonably foreseen, the objects of the trust might be defeated in whole or in part by the investment, or continuance of the investment, of all the funds of such trust in the kinds of investments to which the trustee is then limited by the statutes of this state or by the instrument or court order creating such trust and that the objects of the trust and the interests of all the beneficiaries thereof, whether vested or contingent, would be promoted by the investment of all, or some part, of the trust funds otherwise, the court shall by its order or judgment. . .authorize or direct the trustee of such trusts to invest the whole, or such part thereof as it shall designate, in any class of investments, including common or preferred stocks of corporations of this state or of any other state or country, which in its judgment will promote the objects of the trust and the interests of all the beneficiaries thereof."

For the purpose of showing the application and proper interpretation of 1937 R.S. 3:16-17 and 18, plaintiffs put in evidence exemplified copies of the complaints and final decrees in four cases, *Askew v. Fidelity Union Trust Co., Blair Academy v. Trustees of Presbytery, Morris Community Chest v. Wilentz,* and *Smith v. Hardin.* Beneficiaries of the trusts in each of those cases applied to the chancellor for an order authorizing the trustee to invest in "nonlegal invest-

ments." The final decree in each case authorized the trustee to invest in designated stocks. The decrees were based on findings that unforeseen changes endangering the trusts had taken place since the trusts were created. The *Askew, Blair Academy,* and *Smith* cases have not been published. *Morris Community Chest v. Wilentz* is reported 124 N.J. Eq. 580, 3 A 2d 808.

In addition to the decrees put in evidence, our attention is called to *Bliss v. Bliss,* 126 N.J. Eq. 308, 8 A 2d 705, affirmed 127 N.J. Eq. 20, 11 A 2d 13, and *Reiner v. Fidelity Union Trust Co.,* 126 N.J. Eq. 78, 8 A 2d 175, reversed 127 N.J. Eq. 377, 13 A 2d 291, 128 A.L.R. 964.

The *Bliss* and *Reiner* cases were the only two to reach the Court of Errors and Appeals, then New Jersey's court of final authority. Needless to say, the law as declared by that court is the law which must be applied here.

The vice chancellor said in *Morris Community Chest v. Wilentz, supra*: "The Legislature by enactment of the cited statute, to my mind, made it clear that it recognized that the court had jurisdiction to act, and that presently conditions were such, in the opinion of the Legislature, that the court, in proper cases, should act, and it therefore expressly authorized the court in certain instances to act and provided the method of procedure. Among the classes of investments which the Legislature thought might be authorized, were common and preferred stocks, and it recognized by the provisions of the act that conditions presently existed which might make it necessary to invest in common stocks in order to maintain the integrity of a trust fund, and while the inherent power of the court was unlimited, it intended by the statute to limit the power of the court in this respect, and therefore inserted the provision in R.S. 3:16-18 'provided, that the court shall not authorize or direct the purchase of any class of common or preferred stock of any corporation unless such corporation shall have been organized and engaged in the conduct of its business for five calendar years immediately preceding the purchase of the stock of such corporation.' "

In *Reiner v. Fidelity Union Trust Co.,* 126 N.J. Eq. 78, 8 A 2d 175, the trustee challenged the constitutionality of the 1937 statute when applied to trusts created prior to the enactment of the statute. The vice chancellor held the statute constitutional. He cited the *Morris Community Chest* case, *supra,* in support of his conclusion that the statute did not purport to change substantive rights—merely matters of administration over which courts of equity had jurisdiction without necessity for a statute. The vice chancellor reached the conclusion that the evidence established such change of conditions

jeopardizing the trust as warranted the exercise of the power declared by the statute. The trustee appealed. The Court of Errors and Appeals, 13 A 2d 291, approved the vice chancellor's conclusions as to his authority and the validity of the statute, but reversed the decree authorizing the trustee to deviate from the provisions of the trust relating to investments.

Donges, J., speaking for a unanimous court, said: "Here the donor provided that the funds should be invested in legals. The income was to be distributed and, in certain eventualities, the principal was to be distributed, but it does not appear that the purposes of the trust will be defeated because there has been some shrinkage in income. It appears that the sole purpose to be accomplished is to increase income by investing in stocks that will produce more but will not be legals.

"In view of the determination of this court in the case of *Bliss v. Bliss,* 126 N.J. Eq. 308, 8 A 2d 705, affirmed 127 N.J. Eq. 20, 11 A 2d 13, in which there was an affirmance of the decree advised by V. C. Kays dismissing the bill of complaint where there was an effort to increase the income for the benefit of the cestuis que trust, this decree must be reversed. In this case the whole situation was put upon the basis of economics, not the necessity of the beneficiaries. . .In the *Bliss* case there was testimony of a substantial shrinkage of both the value of the corpus and of the income, with resultant inconvience to the cestuis que trust and to the remaindermen on final distribution. But in that case, as in this case, there was no evidence that the purposes of the trust were likely to be defeated. Therefore, the warranty given by the statute for intervention by the Court of Chancery is lacking, and failing this the decree must be reversed."

The vice chancellor filed his decree in the *Bliss* case referred to by the Court of Errors and Appeals on 23 August 1939, 8 A 2d 705. There the testator had authorized his trustee to continue to hold securities received from his estate or to reinvest as permitted by the laws of New York in a restricted group of railway bonds. The beneficiaries contended the authority of the trustee should be amplified so as to permit investment in specifically designated common and preferred stock because such deviation and diversification would result in greater security of principal and would constitute a hedge against inflation. The vice chancellor, notwithstanding a substantial depreciation in the value of the securities held by the trust, declined to authorize the proposed investments. His conclusion was approved by the Court of Errors and Appeals in a per curiam opinion. 11 A 2d 13.

Here the trustees for practical purposes seek to set aside in toto the restrictions in the trust instrument with respect to investments.

They correctly say the additional authority given them by the court's decree does not in fact modify the provisions of the trust with respect to investments in Duke Power Co. Literally that is true. They already have full authority to sell any part or all of the stock they hold in Duke Power Co. But if they sell it, they must invest the proceeds in governmental obligations. That they do not wish to do.

The testimony on which they rely for the authority sought comes from experts in the field of investments. Their opinion that the requested authority should be granted is based on two propositions: First, there is an undue concentration of stock ownership in industries and companies.

Mr. Dickey testified: "I would say that the exercise of prudence, all other things being equal, would dictate definitely that the funds would be safer with a greater degree of diversification. . .I am clearly of the opinion that there is such a high degree of concentration of the over-all holdings of the Endowment in Duke Power that it would definitely not be desirable to increase these." Mr. McCloy said: "I have formed an opinion as to the desirability or undesirability of foundation trustees being subject to restrictive provisions, particularly in respect of investments. In the fast changing world, it is my opinion that the trustees of charitable foundations should be prepared to adjust and have the power to adjust to a variety of possible changes and circumstances which affect the trust. . .Ideally, foundation trustees should have all the latitude necessary to carry out the basic circumstances and the basic purposes of their trust in the face of changes." Mr. Heartt, chairman of the Endowment, chairman of its investment committee, director of Duke Power Co., and chairman of its finance committee, testified: "As to what the Trustees proposed to do if the relief requested in this petition should be granted, we have no plans at all. Our great desire is to be free of the restrictions, to be brought up to date, so to speak, in the investment area so that we will be prepared to exercise judgment and take proper steps when occasions seem to call for it. . . .Duke Power, in growing from a very small water power company to one of the ten largest and one of the most prosperous utilities companies in the country, has counterbalanced any other erosion we might have had. But Duke Power Co. has reached maturity, and I don't think it is possible to hope for a similar experience with it that we have had in the last 20 or 30 years."

The Supreme Court of New Jersey has generously made available to us the record in the case of *Reiner v. Fidelity Trust Co., supra.* We have studied the record, including the evidence on which the vice chancellor based his opinion. Complainants there did not allege a

hazard because of concentration in the securities of two or three companies. They asserted the hazard would arise by investing in fixed dollar obligations when reasonable expectations were that the purchasing power of the dollar would continually diminish. We think it clear from the decision in that case and subsequent interpretations thereof that the New Jersey law requires those seeking permission from a court of equity to ignore the express mandate of the author of the instrument under which they act to do more than show change of economic conditions. *Lambertville Nat. Bank v. Bumster, supra; First National Bank of Jersey City v. Stevens,* 9 N.J. Super. 324, 74 A 2d 368.

The law of New Jersey, as we interpret controlling decisions of the courts of that state, accords with the law announced and applied by courts of other states. *Stanon v. Wells Fargo Bank & Union Trust Co.,* 310 P 2d 1010 (Cal.); *In re Ryan's Estate,* 169 N.Y.S. 2d 804; *Hanover Bank v. Lamm,* 142 A 2d 528 (Conn.); *In re McDonough Trust,* 109 N.W. 2d 29 (Iowa).

In effect, the testimony on which plaintiffs relied served only to remind the court of the adage that a prudent person does not carry all his eggs in one basket. Can it be said that Mr. Duke's failure to heed this admonition warrants the court in making a contract which he was not willing to make? History records that Mr. Duke was a successful businessman. His genius brought into existence the American Tobacco Co., a financial giant ordered dissolved under the antitrust laws. *United States of America v. American Tobacco Co.,* 221 U.S. 106, 55 L. ed. 663. Mr. Cocke, one of the plaintiffs and one of the original trustees, testified that he participated in the preparation of the trust indenture. "It was under consideration and preparation for quite a considerable time, with long and careful consultation with Mr. Duke and direction by him."

John Wilber Jenkins, author of *James B. Duke: Master Builder,* published in 1927, opens his biography with this sentence: " 'America has many merchant princes and captains of industry, but only three industrial kings: John D. Rockefeller in Oil, Andrew Carnegie in Steel, and James B. Duke in Tobacco,' a financial writer recorded in *Leslie's Weekly* more than twenty years ago. That was the judgment of others, in and out of Wall Street." Mr. Jenkins quotes Mr. Duke as saying: "This is a harder job (preparation of the trust indenture) than I thought it would be. I'm beginning to think it is almost as difficult for a man to give away his money rightly as it is to make it." In view of the testimony and history of which we take judicial notice, can it be said that Mr. Duke was not aware of the hazard

inherent in the investment of all, or a major portion of, the trust assets in a single company or even in a single kind of business? The answer must, we think, be no. It must not be forgotten that Mr. Duke had as much right to name the securities in which the funds should be invested as he had to name the beneficiaries.

It may be that Duke Power Co. was a mere adolescent when Mr. Duke was preparing the trust instrument and that it has now reached maturity, but there is nothing in the record tending to indicate that it is approaching decadence. To the contrary, the evidence shows it is now engaged in expending some $60,000,000 to $70,000,000 for a hydroelectric plant which will have, when completed, a capacity of 350,000 kw. The capacity of all plants generating electricity in North Carolina at the end of 1924 was 303,389 kw. (P. 85,, Electric Power Statistics 1920-1940, issued by Federal Power Commission.) Another public utility operating in this state recently dedicated a hydroelectric plant on the Roanoke River costing approximately $45,000,000.

Mr. Duke recommended Duke Power Co. and its subsidiaries to the trustees "as the prime investment for the funds of this trust" and requested the trustees "to see to it that at all times these companies be managed and operated by the men best qualified for such a service." Seven of the sixteen directors of Duke Power Co. are trustees of the Duke Endowment. How well the trustees have complied with Mr. Duke's request is best illustrated by comparing the value assigned to and the income derived from the Duke Power Co. stock when placed in the Endowment with the value and income derived from the same stock now. The result demonstrates Mr. Duke's wisdom both as to a source for income and the human agencies selected for its efficient operation.

The second reason assigned to justify the order is that governmental obligations are payable in dollars, the purchasing power of which may reasonably be expected to depreciate. Hence, long-term governmentals are not suitable. Short-term governmentals bear such a low rate of interest that they are not suitable.

We have given careful consideration to the evidence and the arguments made in support of the request that the trustees now be given carte blanche authority with respect to the investment of Endowment funds. Past adherence to the provisions of the trust agreement has, as Mr. Duke wished, promoted the economic as well as the social welfare of this and our sister state. The evidence fails to establish facts necessary for an order authorizing the trustees to disregard the express provisions of the trust indenture. The court should have allowed the

motion for nonsuit.

Reversed.

HIGGINS, J., concurring:

By the indenture now before us, Mr. Duke manifested a clear intent that the beneficiaries of the Endowment and the business enterprises which he helped to create should complement and support each other. By the third division of the indenture the trustees were required to lend surplus funds to the Duke Power Company or to invest them in its securities, or in those of its subsidiaries. The amount of the surplus emphasizes the importance of this right.

Manifestly the court cannot take away from Duke Power Company, or from its subsidiaries, this preference without their presence before the court. Their presence must be in their corporate capacities. The court should have required that these corporations be made parties to the proceeding and be given an opportunity to be heard before impairing their rights under the indenture.

The majority opinion, in which I fully concur, reverses the judgment of the Superior Court, hence the indenture remains as executed. My only purpose is to call attention to what I consider a defect of parties.