# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEPHEN B. RIZOTI; GREGORY H.
PLEMMONS,

$\qquad$ *Plaintiffs-Appellants,*

v.

HAROLD PLEMMONS,

$\qquad$ *Defendant-Appellee.*

No. 03-1159

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(CA-01-160-5-V)

Argued: September 25, 2003

Decided: December 5, 2003

Before WILKINS, Chief Judge, and WIDENER and
LUTTIG, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Christopher D. Lane, MCELWEE LAW FIRM, P.L.L.C.,
North Wilkesboro, North Carolina, for Appellants. Cynthia
Van Horne McNeely, POYNER & SPRUILL, L.L.P., Charlotte,
North Carolina, for Appellee. **ON BRIEF:** William H. McElwee, III,
MCELWEE LAW FIRM, P.L.L.C., North Wilkesboro, North Caro-
lina, for Appellants. E. Fitzgerald Parnell, III, POYNER & SPRUILL,
L.L.P., Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

## OPINION

PER CURIAM:

Stephen B. Rizoti (Rizoti) and Gregory H. Plemmons (Plemmons)
(collectively, "Plaintiffs") appeal a district court order granting sum-
mary judgment against them in their action against Harold Plemmons
("Defendant"), arising from an alleged breach of an agreement to
form a business. Finding no error, we affirm.

### I.[1]

Defendant is the founder and former president of Golden Needles
Knitting, Inc. (Golden Needles), a North Carolina glove manufactur-
ing company. In April 1997, Defendant sold the company to Ansell
Protective Products, Inc. (Ansell). In conjunction with the sale,
Defendant signed a noncompete agreement, under which he was to
receive $6.8 million plus interest at the expiration of a three-year non-
compete period.

Rizoti was employed by Golden Needles from 1992 to 1997 and
subsequently by Ansell. Defendant approached Rizoti in early 1998
about founding a new glove business in Wilkes County, North Caro-
lina. Rizoti was receptive to the idea, and Defendant subsequently
asked him to produce a business plan for the new business. In the
months that followed, Defendant advised Rizoti regarding revisions
to the plan and, in June 1999, directed Rizoti to discuss their plan
with Charlie Drum, another Ansell employee. Defendant also encour-
aged Rizoti to invite Plemmons, who is Defendant's nephew and who
had worked in the glove industry in various capacities since 1989, to
become involved in the new business.

---

[1]Because the district court granted summary judgment against Plain-
tiffs, we view the forecasted evidence in the light most favorable to them.
*See Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 190 F.3d 252, 255 (4th
Cir. 1999).

In October 1999, at Defendant's Florida home, Plaintiffs and Defendant reached an oral agreement to go into business together. Under the agreement, Rizoti, Plemmons, and Defendant would each be one-third owners; Rizoti and Plemmons would manage the company's day-to-day business; and Defendant would contribute the $6.8 million plus three years of interest that he expected to receive from his noncompete agreement. As part of the agreement, Defendant also promised to serve as company president; "to contribute his skill, knowledge, experience and contacts in the glove manufacturing business to the new business"; "to be involved in all large business matters, entertain the larger business customers, attend all the national shows, and participate in negotiating contracts for the new business"; to "be an integral part of the new business' marketing and management team"; and "to use his leverage in the glove industry to help the success of the new business." J.A. 10-11.

On November 18, 1999, Plaintiffs incorporated the business as "Platinum Protective Products, Inc." (Platinum). Soon thereafter, they left their respective jobs to work for Platinum full-time. Plaintiffs obtained $1,000,000 in startup financing from Ralph and Mark Atwood, through the Atwoods' company, the Red Steer Glove Company. And, as part of an effort to maintain the appearance that Defendant was not yet involved in the business—and thus, not competing with Ansell—Plaintiffs entered into a formal shareholder agreement with the Atwoods stating that the Atwoods owned 40 percent of Platinum, and Plaintiffs each owned 30 percent.

In the months that followed, Defendant continued to advise Plaintiffs on many topics relating to Platinum and even personally recruited some employees. Throughout this time, Defendant repeatedly reassured Plaintiffs that he would perform as promised when his noncompete agreement expired. On April 25, 2000, the day after the expiration of the noncompete agreement, Drum called Rizoti and told him that Defendant would soon have the money from the noncompete agreement. However, Drum also told Rizoti that Defendant would never become a part of Platinum. Still, when Rizoti called Defendant the next morning and asked him about Drum's assertion, Defendant insisted that Drum did not speak for him.

By June 2000, although Defendant continued to reassure Plaintiffs that he would soon be joining them as planned, he still had not pro-

duced the capital for Platinum. On June 15, Defendant discussed with the Atwoods the possibility of purchasing their Platinum shares; although the Atwoods were generally receptive, the parties failed to reach an agreement. At the conclusion of this meeting, Defendant asked Rizoti for Platinum's current financial statements and its sales and profit projections. And, Defendant again confirmed that he would soon be involved with the company. Five days later, however, he informed Plaintiffs that he would neither make the capital contribution he had promised nor become a part of Platinum. As a result, Plaintiffs' shares of Platinum lost all value.

Plaintiffs subsequently sued Defendant in North Carolina Superior Court for breach of contract, breach of fiduciary duty, 'constructive fraud, and violation of the North Carolina Unfair and Deceptive Trade Practices Act (UTPA), *see* N.C. Gen. Stat. § 75-1.1 (2001). Defendant removed the suit to the Western District of North Carolina, where the district court granted summary judgment to Defendant on all causes of action.

## II.

We review the grant of summary judgment de novo, viewing the facts in the light most favorable to Plaintiffs. *See Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 190 F.3d 252, 255 (4th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

Plaintiffs first contend that the district court erred in ruling that the contract claim was barred by the Florida statute of frauds.[2] We disagree.

---

[2]Plaintiffs also challenge the alternative ruling that the alleged contract was unenforceable because there was no meeting of the minds among the parties on the issue of how and at what price Defendant would obtain a third of the company. In light of our holding regarding the statute of frauds, we do not address this issue.

Plaintiffs begin by arguing that the law of North Carolina, not that of Florida, applies to the contract claim because the contract was to be performed in North Carolina. That is incorrect. Under North Carolina choice of law rules, which the parties agree govern this issue, the validity and interpretation of a contract is generally governed by the law of the state in which the contract was formed. *See Tanglewood Land Co. v. Byrd*, 261 S.E.2d 655, 656 (N.C. 1980). However, the general rule does not apply when "a contract is to be performed *wholly* outside the state in which the contract was made." *Cocke v. Duke Univ.*, 131 S.E.2d 909, 913 (N.C. 1963) (emphasis added) (internal quotation marks omitted). In that circumstance, the law of the place of performance governs. *See id.* In their complaint and in their deposition testimony, Plaintiffs assert that Defendant had no intention of running Platinum's day-to-day operations in North Carolina, that the first national trade show Defendant was to attend for Platinum was in Florida, and that Defendant was to entertain Platinum customers at his Florida home. Thus, the record establishes as a matter of law that Defendant's performance was not to take place wholly outside of the state of formation, Florida. Florida law therefore governs the contract.

Plaintiffs also argue that even if Florida law applies, the contract claim is not barred by the statute of frauds because the contract was capable of being performed within a year. Under Fla. Stat. Ann. § 725.01 (West 2000), "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise upon which such action [is] brought . . . [is] in writing and signed by the party to be charged."

> [W]hen no time is agreed on for the complete performance of the contract, if from the object to be accomplished by it and the surrounding circumstances, it clearly appears that the parties intended that it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year.

*Yates v. Ball*, 181 So. 341, 344 (Fla. 1937).

Here, Plaintiffs' argument that the contract claim is not barred by the Florida statute of frauds might succeed if we focused only on Defendant's obligation to contribute financially to the company. However, Plaintiffs have alleged in their complaint and depositions that Defendant also agreed to make extensive use of his personal skills, experience, and contacts. Moreover, in their respective depositions, Plemmons testified that he had anticipated doing business with Defendant for "[a] number of years," and Rizoti had anticipated that Defendant's participation would last "five years at an absolute minimum." J.A. 92, 117. Thus, it is clear that the parties intended that Defendant's performance would extend beyond one year.

Plaintiffs also argue that the Florida statute of frauds does not bar their contract claim because the contract was to enter into a joint venture and "[j]oint venture agreements are not required to be in writing," *De Ribeaux v. Del Valle*, 531 So. 2d 992, 993 (Fla. Dist. Ct. App. 1988). A "joint venture" is defined as "a special combination of two or more persons, who, in some specific venture, seek a profit jointly without the existence between them of any actual partnership, corporation, or other business entity." *Fla. Trading & Inv. Co. v. River Constr. Servs.*, 537 So. 2d 600, 602 (Fla. Dist. Ct. App. 1988) (internal quotation marks omitted). A joint venture "is limited to a specific enterprise or object." *Hayes v. H.J.S.B.B. Joint Venture*, 595 So. 2d 1000, 1002 (Fla. Dist. Ct. App. 1992).

Here, the alliance the parties allegedly sought to form was not merely for some particular enterprise or object. Rather, the agreement was to form a business that would have continued for an indefinite duration. *See Kislak v. Kreedian*, 95 So. 2d 510, 514 (Fla. 1957) (explaining that the term "joint adventure" refers "to a single transaction" but not "to a general and continuing business of a particular kind"); *Weinsier v. Soffer*, 358 So. 2d 61, 63 (Fla. Dist. Ct. App. 1978) (holding that "[a]n oral agreement to enter into a new business which will continue indefinitely" is unenforceable under the statute of frauds); *see also Bross v. Wallace*, 600 So. 2d 1198, 1199 (Fla. Dist. Ct. App. 1992) (per curiam) (stating that enforcement of an oral agreement to purchase a restaurant and franchise rights and "establish an ongoing business" would be barred by the statute of frauds). Thus, Plaintiffs have failed to create a genuine issue of fact regarding whether the parties contracted to enter into a joint venture.

Plaintiffs further maintain that even if the statute of frauds would otherwise bar their contract claim, Defendant is equitably estopped from contesting the validity of his agreement by virtue of Defendant's repeated confirmations that he would become involved in the business and infuse it with his capital. In rejecting the estoppel argument, the district court properly relied upon *Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777 (Fla. 1966), in which the Florida Supreme Court declined to "adopt by judicial action the doctrine of promissory estoppel as a sort of counteraction to the legislatively created Statute of Frauds." *Tanenbaum*, 190 So. 2d at 779. This reasoning controls here, and there is no indication that the Florida Supreme Court would abandon that analysis were it presented with the facts before us. In support of their argument that the district court erred, Plaintiffs rely not on a subsequent Florida Supreme Court case, but only on a lower court opinion that did not cite *Tanenbaum* and that the Florida Supreme Court never reviewed. *See Gleason v. Leadership Housing, Inc.*, 327 So. 2d 101, 104-05 (Fla. Dist. Ct. App. 1976). The district court therefore properly ruled that the contract claim was barred by the Florida statute of frauds. *See Doe v. Doe*, 973 F.2d 237, 240 (4th Cir. 1992) (explaining that the function of this court in a diversity case is to resolve the state law issues as we predict the highest court in the state would).

### B.

Plaintiffs also maintain that the district court erred in granting summary judgment on their constructive fraud and breach of fiduciary duty claims. We disagree.

The parties agree that North Carolina law governs these causes of action. In order to prove constructive fraud, a plaintiff must prove the existence of a fiduciary duty. *See Keener Lumber Co. v. Perry*, 560 S.E.2d 817, 823 (N.C. Ct. App.), *review denied*, 568 S.E.2d 196 (N.C. 2002). A fiduciary duty arises when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Curl v. Key*, 316 S.E.2d 272, 275 (N.C. 1984) (internal quotation marks omitted). No such duty arises from a mere contractual relationship. *See Branch Banking & Trust Co. v. Thompson*, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992).

Plaintiffs maintain that a fiduciary duty arises between parties to a joint venture and that the district court erred in holding as a matter of law that Plaintiffs and Defendant were not joint venturers. For the reasons we have already discussed, however, we hold that the district court correctly ruled as a matter of law that Plaintiffs and Defendant were not joint venturers.

Plaintiffs also argue that their view of Defendant as "the most respected person . . . in the glove industry" and Plemmons' nephew-uncle relationship with Defendant gave rise to a fiduciary duty. J.A. 395. Although Plaintiffs' experience was not as extensive as Defendant's, the gap was certainly not so great as to give rise to a fiduciary duty. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) (holding no fiduciary duty arose under North Carolina law between franchisor and franchisees because franchisees were "independent, sophisticated, if sometimes small, businessmen who dealt with [the defendant] at arms' length and pursued their own business interests"). Indeed, Plemmons testified that, within the glove industry, he and Rizoti "were known as folks that knew what [they] were doing." J.A. 243. Nor was the fact that Defendant was Plemmons' uncle sufficient to create a fiduciary relationship. *See Benfield v. Costner*, 313 S.E.2d 203, 205 (N.C. Ct. App. 1984) (holding that "a 'mere family relationship' is not . . . enough to establish a . . . fiduciary relationship"). Thus, the district court properly granted summary judgment against Plaintiffs on these causes of action.

C.

Plaintiffs next argue that the district court erred in granting summary judgment against them on the UTPA claim. We disagree.

To state a UTPA claim, Plaintiffs must allege and show "(1) that defendant committed an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately cause[d] actual injury to plaintiff[s]." *B & F Slosman v. Sonopress, Inc.*, 557 S.E.2d 176, 182 (N.C. Ct. App. 2001), *review denied*, 560 S.E.2d 795 (N.C. 2002). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C.

1981). In a business context, "[i]t is well established that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action" under § 75-1.1. *Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc.*, 477 S.E.2d 262, 266 (N.C. Ct. App. 1996). To sustain a cause of action, Plaintiffs are required to allege and prove that "substantial aggravating circumstances" attended the breach. *Id.* Indeed, in any context, some kind of "egregious or aggravating circumstances must be alleged and proved before the Act's provisions may take effect." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (alterations & internal quotation marks omitted). Additionally, when a UTPA claim is based on alleged misrepresentations, the plaintiff must show that the misrepresentations complained of proximately caused them actual injury. *See Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) (applying North Carolina law); *Mosley & Mosley Bldrs., Inc. v. Landin Ltd.*, 389 S.E.2d 576, 579 (N.C. Ct. App. 1990).

Plaintiffs contend that Defendant committed unfair or deceptive acts not simply by intentionally breaching the contract, but rather, by also repeatedly reassuring them of his continued commitment after the contract was formed. However, Plaintiffs have failed to forecast evidence establishing a prima facie UTPA case as to either the initial assent to the agreement or the subsequent reassurances. With regard to the initial assent, Plaintiffs have not shown that Defendant intended to renege on his promises when he made them; thus, they have failed to show that his formation of the agreement was deceptive. *Cf. Process Components, Inc. v. Baltimore Aircoil Co.*, 366 S.E.2d 907, 911 (N.C. Ct. App.) (holding that defendant-manufacturer's acts were sufficiently deceptive when defendant promised plaintiff an exclusive distributorship while defendant was still bound to agreement with another distributor), *aff'd*, 374 S.E.2d 116 (N.C. 1988) (per curiam). It might be argued that it could be inferred from Drum's telephone call to Rizoti in late April 2000 that Defendant had decided by that time not to fulfill his obligations. However, even assuming that to be true, Plaintiffs have failed to forecast evidence that Defendant's reassurance at that late date proximately caused them any injury. The district court therefore properly granted summary judgment against Plaintiffs on the UTPA claim.

## III.

In sum, for the foregoing reasons, the district court properly granted summary judgment to Defendant on all causes of action.

*AFFIRMED*